McBIRNEY & ASSOCIATES, Appellant,

v.

STATE of Alaska, Appellee.

No. S–1896.

Supreme Court of Alaska.

April 15, 1988.

W.D. Bennett and James N. Leik, Perkins Coie, Anchorage, for appellant.

Marcus R. Clapp and John V. Acosta, Hughes, Thorsness, Gantz, Powell & Brundin, Fairbanks, for appellee.

Before MATTHEW, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

OPINION

COMPTON, Justice.

This case arises out of a contract between the State of Alaska and McBirney & Associates (McBirney), a general partnership and building owner, to lease to the state office space in Fairbanks. The attorney general advised that the contract was void due to irregularities in the manner by which it was obtained by McBirney. McBirney sued to enforce the contract. The superior court granted the state's motion for summary judgment. We affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND

It was a policy goal of Governor William A. Sheffield's administration to consolidate state offices in geographically central loca-

tions in various cities in Alaska.[1] The Fairbanks North Star Borough, the Fairbanks Chamber of Commerce, the City of Fairbanks and the Fairbanks state legislative delegation all favored consolidation of state offices in the downtown area. The Fairbanks Development Authority (FDA) previously had identified a large priority area and a smaller special priority area for redevelopment. Governor Sheffield testified that as early as 1983 he recognized the old Fairbanks North Star Borough office building as an appropriate site for state office consolidation in Fairbanks.

In August 1983, McBirney completed its purchase of the Fairbanks North Star Borough office building. The borough was scheduled to vacate the building and lease office space elsewhere. McBirney was interested in getting the state to consolidate its offices in the old borough building, which it had renamed the Fifth Avenue Center. To this end, McBirney's realtor obtained information from the state about the amount of space the state required.

After the state completed a study of office space requirements, Richard Peterson, a Department of Administration (DOA) leasing agent, surveyed the Fairbanks area. He then consulted with his supervisor, Barry Jackson, and Director of the Division of General Services in the DOA, Bob Link. The trio made two decisions. First, a bidding zone for the location of the office space was defined in the downtown Fairbanks area. This zone was nearly identical to the boundary of the large area of "preferred development" established by the FDA for downtown revitalization. Second, the group established the occupancy target date as "not earlier than July 1, 1985; not later than January 1, 1986." This flexibility in occupancy dates would permit bids both by owners of existing buildings and owners of vacant lots willing to build to suit the state's needs.

The bidding documents incorporating these geographic boundaries and occupancy dates were prepared in mid-September and sent to DOA offices in Juneau for approval. Deputy Commissioner of Administration Anselm Staack received the documents on September 18, 1984 and gave them to Governor Sheffield's chief of staff, John Shively, the next day. Shively gave Staack his verbal approval of the documents on September 25.

A key figure in subsequent events is Lenny Arsenault, a personal friend of and fundraiser for Governor Sheffield. McBirney & Associates is a general partnership made up of four groups of persons. One of these groups, R & O Partnerships, owns 48% of McBirney. Members of R & O included Lenny Arsenault and Gerald Richards.

Arsenault contacted Governor Sheffield and requested a copy of the Request for Proposal (RFP) on the Fairbanks project. Governor Sheffield instructed his executive assistant, Laurie Herman, to send Arsenault a copy of the RFP as soon as it was ready. Herman obtained a copy of the draft RFP and sent it by express delivery to Arsenault, who received it September 24, a day before it had been approved by Shively. Governor Sheffield testified that at this time he was unaware whether the RFP was generally available. The copy Herman sent to Arsenault, however, was stamped "draft." In fact, the RFP was never issued publicly.[2]

On October 2, 1984 Arsenault went to Juneau to meet with Governor Sheffield and Shively where he gave them a map given to him by his partner Richards. Arsenault told them that the "core" area of downtown Fairbanks depicted in the Richards map was the most appropriate area in which to consolidate state offices. Arsenault also expressed a desire to have the

---

1. The state's action in voiding this lease was a result of a grand jury investigation of the manner in which the lease was obtained. The transcript of that investigation was made a part of the record in this case. That transcript was relied on for many of the facts in this case.

2. McBirney states in its opening brief that the RFP was made public several days after Arsenault received the draft. This assertion is unsupported by the record. The state challenged this assertion and supported its challenge with grand jury testimony. McBirney did not refute the state's challenge in its reply brief.

project completed sooner than proposed, perhaps by July 1985.

Arsenault then met separately with Shively, who agreed to take the proposed changes to the DOA and try to convince the DOA to have them incorporated into the final bid specifications. Arsenault gave Shively a description of the boundaries McBirney wanted. Shively knew that if the changes requested by Arsenault were implemented, McBirney would be the only potential bidder who could meet the requirements and the DOA would have to proceed to contract on a direct negotiation, "sole source" basis.

Later that same morning, Staack met with Shively in Shively's office to discuss the Fairbanks office RFP. Shively told Staack that the occupancy date was to be changed so that all of the space would be available by July 1, 1985 rather than allowing flexibility to January 1, 1986. Staack called Barry Jackson from Shively's office to ascertain the effect that change would have on existing state leases. Jackson replied that the change would have minimal impact on existing state leases, but that it would eliminate any bidding competition from new construction. Shively then handed Staack a letter-size sheet of paper containing a new description of the bidding zone for the Fairbanks office complex, being that proposed by McBirney. Shively admitted that he passed the proposed changes on to Staack.

Staack now had three separate maps for downtown Fairbanks with certain outlined areas. The first map was the original bidding document map, which was the large FDA downtown priority area. The second map showed the smaller FDA special priority zone. The third map showed Shively's desired zone, which was the smallest of the three and which excluded even the existing state office building. On October 3, Staack sent these maps to Shively in Anchorage, along with the explanatory note warning that new construction would be precluded by the July 1 occupancy date and recommending consideration of the second, middle zone. Staack then requested his employees to conduct a real estate survey in the zones depicted in the three maps to determine the likelihood of competition in each area.

On October 4, Shively called Staack and told him that he, Shively, knew that he could not ask for a zone that excluded existing state office buildings, and told Staack to specify the middle zone for use in the bidding documents. The results of the real estate survey came the next day. They showed that with a July 1, 1985 occupancy date, both of the zones specified by Shively, the smallest and middle zones, contained only one potential bidder: The Fifth Avenue Center.

On October 8, Shively told Arsenault that the bidding zone would have to be expanded because Arsenault's zone did not even contain the state courthouse or the existing state office building in downtown Fairbanks; Arsenault's zone was so small it would have prevented the state from leasing the building immediately adjacent to its existing buildings. When Arsenault conveyed this information to Richards, Richards told him not to worry because the expanded zone was just as good as the one they originally requested.

Contemporaneous with these activities, Staack, Link and Moore [3] sought advice from an attorney in the Government Affairs Section of the Attorney General's office. This section is the principal legal advisor to Governor Sheffield. They apparently complained that "they were concerned that there was undue pressure leading them to reduce the zone in procurement to a level which they thought was inappropriate...." The matter was brought to the attention of section supervisor James Baldwin and Attorney General Norman C. Gorsuch.

After review, Baldwin concluded that "we had no business doing a sealed procurement in that area, that the best way to proceed in that case would either be not to proceed at all, to enlarge the zone, or to go with what we call a sole-source procurement where you negotiate directly with the

---

**3.** Bruce Moore was Deputy Director of the Division of General Services and Supply at the time.

known vendor." After further discussions with DOA personnel and Shively, Baldwin concluded that the appropriate way to proceed was through a sole source procurement. Baldwin further noted that Shively was "entirely cooperative with [him] the whole time."

Baldwin advised the DOA, Division of General Services and Supply, of the content necessary for the bid waiver justification. He did not, however, review the bid waiver after it was prepared. Baldwin explained that "a fairly significant percentage of contracting in the state is done under a bid waiver, and if I were to see all of them, I suppose I would spend all my time doing that. I only see the ones that they bring to my attention."

On November 13, 1984 Staack approved a bid waiver. It had been prepared by Link and initially reviewed by Mr. Moore, his superior.[4] Negotiations between the state and McBirney over several months resulted in the signing of the contract in February 1985.

On July 2, 1985, after Grand Jury proceedings on the matter, Attorney General Gorsuch advised the state to void the lease because the Grand Jury findings revealed that the lease was "tainted by favoritism." 1985 Op.Att'y Gen. (No. 3) at 78. The state declared the lease void on July 3.

McBirney filed its complaint on September 9, 1985 seeking a declaratory judgment, specific performance of the contract and damages. The state's motion for summary judgment was granted and the superior court dismissed McBirney's complaint. McBirney appeals.

## II.  DISCUSSION

### A.  THE SUPERIOR COURT DID NOT ERR IN AWARDING SUMMARY JUDGMENT TO THE STATE.

■  In reviewing a grant of summary judgment this court must determine, independent of the superior court's findings and conclusions, whether any genuine issues of material fact exist and whether the moving party is entitled to judgment as a matter of law. *Drake v. Hosley*, 713 P.2d 1203, 1205 (Alaska 1986). All reasonable inferences of fact from the proferred evidence must be drawn in favor of the non-moving party. *Zeman v. Lufthansa German Airlines*, 699 P.2d 1274, 1280 (Alaska 1985).

The state has an established procurement process which includes competitive bidding. The purposes of competitive bidding are

to prevent fraud, collusion, favoritism, and improvidence in the administration of

---

4. The bid waiver stated:

> We have been pursuing a goal of consolidating the State's leased presence in locations throughout the state in order to improve efficiency and provide better public service. In Anchorage the City picked the location for our consolidation. In Juneau no specified area has been selected but discussions have begun.
>
> We are now beginning to consolidate the State's space in Fairbanks. The State has one office building (Fairbanks Regional Office Building [FROB]) in the commercial business district but it has outgrown that facility. We plan to place those agencies which fit in an urban setting in a leased downtown facility convenient to the FROB. Not only does this provide a more locational consolidation of the downtown offices but the Division of Telecommunications has advised us that the projected phone system costs will increase substantially as the distance from the FROB increases.
>
> The City of Fairbanks, through the Fairbanks Development Authority, has identified an area of downtown Fairbanks as their priority area for development. This area is defined in Fairbanks city ordinance 3906 as bounded by:
> North: North bank of the Chena River;
> South: Eighth Avenue;
> East: Noble Street;
> West: Wickersham Street.
> Based on this boundary, a survey of potential locations for a long term lease of office space was conducted. This survey revealed that only one vendor within the area could presently supply the required office space. Any other source within the boundary would have to be constructed and construction could very well delay occupancy beyond the expiration of existing leases. The ordinance also extends emphasis to existing downtown properties.
>
> Based on the ordinance's boundaries and the survey which revealed only one existing vendor, we recommend the formal bidding requirement be waived and the division be allowed to negotiate directly with the sole vendor in an effort to establish an acceptable lease agreement.

public business, as well as to insure that the [state] receives the best work or supplies at the most reasonable prices practicable.

... [T]he requirement of public bidding is for the benefit of property holders and taxpayers, and not for the benefit of the bidders; and such requirements should be construed with the primary purpose of best advancing the public interest.

*Gostovich v. City of West Richland*, 75 Wash.2d 583, 452 P.2d 737, 740 (1969); *accord Spiniello Constr. Co. v. Town of Manchester*, 189 Conn. 539, 456 A.2d 1199, 1201 (1983); *City of Baltimore v. Bio Gro Systems*, 300 Md. 248, 477 A.2d 783, 785 (1984); *Weber v. City of Philadelphia*, 437 Pa. 179, 262 A.2d 297, 300 (1970).

It has been said about the competitive bidding process generally that "[t]he whole matter is to be conducted with as much fairness, certainty, publicity, and absolute impartiality as any proceeding requiring the exercise of quasi-judicial authority." *Platt Elec. Supply, Inc. v. City of Seattle*, 16 Wash.App. 265, 555 P.2d 421, 427 (1976) (quoting 64 Am.Jur.2d *Public Works and Contracts* § 80, at 940 (1972)).

■ In keeping with this rule, courts have guarded against the award of a public contract to a bidder who has received an unfair competitive advantage over other bidders.[5] Recently, in *Jensen & Reynolds Const. Co. v. State, Dep't of Transp.*, 717 P.2d 844 (Alaska 1986), this court reversed a superior court conclusion that the state had a reasonable basis for awarding a highway construction contract to the second lowest bidder. *Id.* at 848. Jensen & Reynolds had submitted the lowest bid but their bid contained a mistake: one line item was listed in numerals as "3,500.00" but was written as "Thirty-five Thousand Dollars."

*Id.* at 845. The contracting officer had applied the rule of construction established in the Standard Specifications that in the case of a discrepancy, prices written in words shall govern over prices written in figures. *Id.* at 846. Application of this construction resulted in raising Jensen & Reynold's bid above that of the next lowest bidder, and the state awarded the contract accordingly. In directing that Jensen & Reynolds be awarded the contract, this court stated:

We can determine whether a competitive advantage would result in awarding the contract to Jensen by asking whether Jensen might be able to argue with success [i.e. had it been awarded the contract] that its mistake was in the numerical unit price, rather than the written price, and therefore that it should be able to withdraw its lower bid or obtain the contract on the basis of the higher bid. Such a result would put Jensen in a competitively advantageous position, a position which our cases are unanimous in condemning.

*Id.* at 848. *Accord Alaska Int'l Constr., Inc. v. Earth Movers*, 697 P.2d 626, 628 (Alaska 1985).

In order to promote honest competition on an equal basis, the state is required to reject bids which vary materially from the specifications set forth in the publicized request for proposal. *Chris Berg, Inc. v. State, Dep't of Transp.*, 680 P.2d 93, 94 (Alaska 1984); *King v. Alaska State Housing Authority*, 512 P.2d 887, 892 (Alaska 1973). A variance is considered material if it gives one bidder "a substantial advantage over other bidders and thereby restricts or stifles competition." *Chris Berg, Inc.*, 680 P.2d at 94. Thus, this court has shown itself willing to protect the integrity of the state's competitive bidding process on numerous occassions.

5. McBirney argues that this is a "sole-source" case, not a bidding case, and that all this court should determine is whether the state acted reasonably in deciding to contract "sole-source." But as discussed below, the state cannot be allowed to use the sole-source process to circumvent competitive bidding requirements. *See, e.g., City of Baltimore v. Bio Gro Systems*, 300 Md. 248, 477 A.2d 783, 787 (1984). More-

over, the potential for abuse increases as the amount of publicity surrounding a particular public works project decreases. Thus, the earlier in the process the improper influence is brought to bear, the less likely it will be detected. Finally, this project might have been put out for bid had McBirney not been so successful, at preliminary stages of consideration, at eliminating its competition from consideration.

Other courts have demonstrated a similar interest. In *City of Baltimore v. Bio Gro Systems*, 477 A.2d at 783, Baltimore used a so-called "option to renew" provision in its existing contract with a waste disposal company to renegotiate price and other terms for the "renewal" period rather than publicly soliciting bids for the service upon expiration of the contract. *Id.* at 784–85. The court reasoned that since the city's charter provision requiring competitive bidding was for the benefit of the public, "any private agreement which tends to prevent or restrict competition, or any scheme which has the effect of promoting favoritism, circumvents the statute and is contrary to the public policy of the State." *Id.* at 785–86 (quoting *Hanna v. Board of Educ. of Wicomico County*, 200 Md. 49, 87 A.2d 846, 849 (1952)). The court concluded:

> Although there is no evidence of impropriety in this case, the use of private negotiations to award government contracts invites favoritism, extravagance, fraud and corruption. The plain fact is that Enviro–Gro and the City engaged in just that type of activity that the competitive bidding requirement of the City Charter was designed to prevent.... [T]he City cannot do indirectly what it is prohibited from doing directly. Therefore, the 1983 Contract extending the original agreement between the parties, having been adopted by the City in violation of [the bidding requirement contained in] its Charter, is void and unenforceable.

*Id.* at 787. Like the "option to renew" provision in *City of Baltimore*, the pre-solicitation negotiations between McBirney and the state should not be allowed to serve as a vehicle for circumventing the competitive bidding laws. *See also American Totalisator Co. v. Seligman*, 34 Pa. Cmwlth. 391, 384 A.2d 242, 262 (1977) ("Private negotiations between a director and a successful bidder through which the terms and conditions of the competitive bids are modified or changed, resulting either to the advantage or disadvantage of the city, are not within the spirit and purpose of the law.") *aff'd* 489 Pa. 568, 414 A.2d 1037 (1980).

Finally, this case is similar to *NKF Eng'g, Inc. v. United States*, 805 F.2d 372 (D.C.Cir.1986), in which the government disqualified a potential bidder on the ground that it had apparently received non-public information, giving it an unfair advantage over its bidding competitors. In *NKF*, Mr. Park, an employee of the contracting agency, had been involved in the preparation of the initial invitation to bid. After the first round of bidding, he left the agency and took a job with one of the bidders. Several months later, the agency requested submission of best and final offers. NKF's final bid was 33% lower than its initial bid. The next largest reduction from initial to final bid submitted was 19%. *Id.* at 373–74. The court concluded: "Whether or not inside information was actually passed from Mr. Park to NKF, the appearance of impropriety was certainly enough for the [contracting officer] to make a rational decision to disqualify NKF." *Id.* at 376. The court then quoted with approval the Court of Claims conclusion that "[a] procurement system powerless to rid itself of an unfair competitive advantage gained through inside information would soon lose every vestige of competitiveness." *Id.* at 377.

The case at bar is much more compelling than *NKF* because here there was demonstrated impropriety, not merely an appearance of impropriety. The undisputed facts establish that McBirney and Governor Sheffield's staff circumvented the competitive bidding process by highly improper means. McBirney received a draft RFP that had not been released to the public, and which was never so released. State officials then accepted suggestions from McBirney for possible revisions to the project specifications.[6] The suggested re-

---

**6.** McBirney refuses to concede that it was the only potential bidder to offer suggested revisions and asserts that its outstanding discovery requests must be answered before the question can be resolved. But the only evidence in the record is that the draft RFP was never issued publicly. Therefore, any negotiations carried on by the state with other potential bidders would have been equally improper and cannot

visions were adopted and so favored McBirney that it became the only potential bidder capable of meeting the specifications. As a result the attorney general could reasonably conclude that McBirney's conduct violated the state's procurement process and the resulting contract was void.

McBirney argues that it merely made suggestions which the state was free to examine independently and adopt or refuse according to its best interests. But the impropriety derives from the fact that the suggestions were made outside the purview of other bidders and the public. Public purview might have produced alternative solutions to the state's concern for avoiding the need to extend existing leases pending the consolidation and satisfying Fairbanks' downtown renovation goals. We observe particularly that "[i]t is entirely possible that [the state] would have benefited financially if the other [honest] bidders had the same opportunity" to suggest revisions to the RFP. *Spiniello Constr. Co.*, 456 A.2d at 1202.

## B. McBIRNEY'S CONSTITUTIONAL RIGHT TO FREE SPEECH DOES NOT EXTEND TO SUPPORT ITS VIOLATION OF THE INTEGRITY OF THE BIDDING PROCESS.

■ McBirney asserts that its conduct was proper because it "simply ... urge[d] the State through elected representatives to adopt a policy [the award of a sole source contract to McBirney] which, albeit in McBirney's interest, was also consistent with the public interest." It argues that if this court adopts an appearance of impropriety standard then the logical extension of the rule will be that, "as a matter of law, those who are political supporters of a politician are prohibited from petitioning that politician with respect to anything which may benefit the supporters." McBirney also argues that such a standard "provides no boundaries or guidelines from which any reasonable politician or citizen

could possibly discern what is or is not proscribed activity." As a result, McBirney asks this court to conclude that such a rule is unconstitutionally vague.[7]

We find these arguments unpersuasive. The result in this case is not reached because McBirney submitted its suggestions to Governor Sheffield's office, nor because those suggestions were in McBirney's self-interest. Instead, the result is reached because McBirney participated in a series of exchanges between it and Governor Sheffield's office which allowed McBirney to obtain and act on information not publicly available. In addition, the exchanges are not conjecture but have been clearly proven. The fairness of the competitive bidding process in particular, and the procurement process in general, demanded that information not available to other potential bidders be withheld from McBirney, and any restriction on constitutional rights is incidental and necessary to insure the integrity and honesty of the process. *Cf. Buckley v. Valeo*, 424 U.S. 1, 58, 96 S.Ct. 612, 653, 46 L.Ed.2d 659, 710 (1976) (ceilings on campaign contributions which safeguard the electoral process without directly impinging rights to engage in political debate found constitutional).

## C. THE TRIAL COURT DID NOT ERR IN DENYING McBIRNEY'S MOTION FOR ADDITIONAL DISCOVERY.

■ McBirney argues that the trial court improperly denied its request to conduct additional discovery which would have allowed McBirney to obtain information on other leases and sole source contracts. McBirney contends the information sought was "highly relevant" because it could show the reasons for which the lease was actually given to McBirney and that the leasing procedures followed in this case were consistent with normal state routine. However, proof of either of these issues is not relevant to the question of whether

be used to argue the propriety of the state's conduct with regard to McBirney.

**7.** McBirney relies on both the first amendment of the United States Constitution and article I,

section 6 of the Alaska Constitution ("The right of the people peaceably to assemble, and to petition the government shall never be abridged.").

McBirney's actions were so improper as to make the contract void *ab initio*. The result in this case turns on the conclusion that McBirney's interaction with Governor Sheffield's office clearly violated the principles of the competitive bidding process. In this case the process was not "conducted with as much fairness, certainty, publicity and absolute impartiality as any proceeding requiring the exercise of quasi-judicial authority." *Platt Elec. Supply, Inc. v. City of Seattle*, 555 P.2d at 427. Therefore the trial court did not abuse its discretion in denying McBirney's requests for additional discovery.

### III. CONCLUSION

The decision of the trial court is AFFIRMED.