593 A.2d 1323

**John J. STAPLETON, Appellant,**

**v.**

**BERKS COUNTY, Anthony J. Carabello, Glenn B. Reber, Michael F. Feeney, and Wheelabrator Pottstown, Inc., Appellees.**

Commonwealth Court of Pennsylvania.

Argued Feb. 12, 1991.

Decided June 24, 1991.

Reargument Denied Aug. 14, 1991.

524

Dennis L. Veraldi, for appellant.

Jeffrey L. Schmehl, for appellees.

Before McGINLEY and KELLEY, JJ., and NARICK, Senior Judge.

NARICK, Senior Judge.

This appeal arises out of a county procurement request for waste disposal services. The waste disposal services were part of Berks County's (County's) implementation of the Municipal Waste Planning, Recycling and Waste Reduction Act (Act).[1]

John J. Stapleton, a citizen and taxpayer of Berks County, commenced this action in the Court of Common Pleas of Berks County by asking for injunctive and other unspecified equitable relief to prevent the County from awarding a waste disposal contract to Wheelabrator Pottstown, Inc. (Wheelabrator).[2] Stapleton named the County, its Commis-

1. Act of July 28, 1988, P.L. 556, 53 P.S. §§ 4000.101–4000.1904.

2. Stapleton is also an employee of Westinghouse Electric Supply Co., a division of Westinghouse Electric Corp. Westinghouse Electric Corp. is the parent corporation of Waste Acquisition, Inc., one of the disappointed bidders.

sioners and Wheelabrator as defendants. By its amended order of October 18, 1990, the court denied the request for a preliminary injunction and all other relief. Stapleton appealed to this Court.

The Appellees in this case filed a Motion to Quash Appeal on the grounds that the action is premature since the Department of Environmental Resources had not yet approved the waste disposal plan including the Wheelabrator contract. The agency has since approved the plan. See 21 Pa.B. 386 (1991). Consequently, we will not give further consideration to the Motion to Quash Appeal.

We note at the outset that our standard of review in an appeal from the grant or denial of a preliminary injunction is to determine whether there are any reasonable grounds for the trial court's decision or whether the rule of law relied on was erroneous or misapplied. *Willman v. Children's Hospital of Pittsburgh,* 505 Pa. 263, 479 A.2d 452 (1984). We reverse in the present appeal because we believe that the lower court misapplied the applicable law.

## THE PROCUREMENT PROCESS

The process of selecting a contractor to provide waste disposal services to Berks County began with the county's "Request for Qualifications" (RFQ). That request required that participating firms have substantial financial resources and disclose any convictions or alleged transgressions of environmental and municipal contracting laws.[3] The pur-

---

**3.** The minimum financial criteria were:
1. The Contractor or Guarantor must have a three year Average Annual Tangible Net Worth of $60 million.
2. The Contractor or Guarantor must have had a three year Average Net Income from continuing operations of at least $10 million.
3. The Contractor or Guarantor must have at least $10 million in working capital or demonstrate similar access to bank lines of credit with commitments of at least 3 years.
4. The Contractor or Guarantor must have an investment grade credit rating on its long term debt or, if both are not rated, have a credit standing of similar quality.
Plaintiff's Exhibit A, p. 3.

pose of the RFQ was to limit participation to firms which were reputable and financially secure.

The County hired a consulting team to assist in the implementation of the Act. The team was comprised of Calhoun Baker, Inc.,[4] a financial consulting firm, Bishop, Cook, Purcell & Reynolds, procurement negotiating counsel, and J.A. Hayden Associates, Inc., engineering consultants. Calhoun Baker, Inc. was also designated team coordinator. The team was responsible for developing the contract specifications, request for proposals, negotiating with the potential contractors, as well as evaluating the returned bids to determine which were responsive and which was the "most economic" bid.[5]

Six companies satisfied the RFQ criteria and were identified as qualified bidders. Three of the six voluntarily withdrew from the field leaving only three competing bidders, Wheelabrator, Waste Acquisitions, Inc. (WAI), and American Re–Fuel.

On August 20, 1990, the County submitted a *draft* copy of the Request For Proposal (RFP) to each of the competing bidders and requested their comments. The bidders had individual discussions and correspondence with the procurement team and revised copies of the RFP were later delivered to the bidders on August 22 and again on August 23, 1990.

On August 23, 1990, the procurement team issued what is intended to be the RFP in its final form. This request acknowledged that the bidders could either propose to build an incinerating facility within the County or propose to process the waste at another facility outside the County. If the out-of-county option were chosen, the RFP accounted for the fact that a bidder might need to construct a transfer

4. Calhoun Baker is a corporation comprised of Lucien Calhoun and one associate. Mr. Calhoun's wife serves as an officer of the corporation.

5. The consulting team determined that the preferred method of waste disposal was the conversion of the waste to energy by means of incineration.

station to accommodate the waste until it could be transferred to the out-of-county site. Both Wheelabrator and WAI proposed plans to process the waste in out-of-county facilities.

Among the contract specifications were the "Baseline Permits Conditions." These were part of the technical requirements for the contract. The Baseline Permits Conditions include emission limits and emission testing requirements, operating requirements, monitoring, recordkeeping, and environmental factors. The RFP also specified that the successful bidder's facility would be subject to the proposed "New Source Performance Standards" (NSPS), which were published as proposed Environmental Protection Agency regulations in 54 Federal Register 52209 (December 20, 1989), and which were expected to go into effect in December 1990.

Bidders taking exception to any technical requirements were instructed to disclose those exceptions in their proposals. Bid compliance with the technical requirements of the RFP were to be measured on a pass/fail basis; bids which substantially met those requirements would pass and be on an equal footing with other bids. Since technical requirements were on a pass/fail basis, bids would be ranked on an economic basis and the County announced it would award the contract to the "most economic" bidder.

Because the contract was long-term, and because the County anticipated that the bidders might propose significantly different plans to provide waste disposal services, it was necessary for the County to develop a method to evaluate and compare the costs of the bids. The County's consulting team therefore developed a computer model which would compute the net present value of each bid. The model incorporated certain economic assumptions into the evaluation in an effort to determine which of the proposals was the most economic.[6] The consulting team translated the economic model onto computer discs and sent

6. Some of those assumptions were: a presumed interest rate over the life of the contract, a fixed volume of trash and a twenty-year term.

them to the bidders for their comments and suggested improvements. Changes were made to the model pursuant to the suggestions of the bidders.

WAI criticized the model because there was no provision to adjust the net present value of its bid for the fact that it was in a position to begin service on the contract several years before Wheelabrator. WAI maintained that because it would commence operation sooner, the County would have to pay out under the contract sooner. A proposal with an earlier starting date and corresponding earlier charges was at a disadvantage, since the model discounted all contract pay-outs to present dollars, and later pay-outs always have a lower net present value than earlier pay-outs of the same amount.

The consulting team agreed with WAI's criticism of the model and changed the necessary parameters of its formula. The revised model assumed the two bidders would commence operation on the same date, though in reality they would not. After making the change, the team sent revised discs to the bidders on August 27, 1990, but did not expressly bring the change in WAI's presumed starting date to Wheelabrator's attention.

The team sent a transmittal memorandum with the revisions which read: "Enclosed is a revised evaluation model for the Berks County project. The revisions reflect minor changes in the Disposal Services Agreement."[7] Wheelabrator called Calhoun Baker to inquire why changes to the program were made. Calhoun Baker did not advise Wheelabrator of the change in WAI's presumed starting date but merely explained that there were changes to the "bond sizing" which did not affect Wheelabrator.

On August 28, 1990, Wheelabrator received a newly revised RFP from Calhoun Baker although that revision still showed an August 23, 1990 date. The first page of this latest revision was identical to the first page of the August 23 RFP.

7. Defendant's Exhibit 1.

## WHEELABRATOR'S PROPOSAL

Wheelabrator proposed to dispose of the waste in its own facility which it planned to build in adjacent Montgomery County. Because of the close proximity of its incinerator to Berks County, Wheelabrator did not anticipate the use of a transfer station; rather, the individual municipalities within Berks County would take the waste directly to the Montgomery County location. Wheelabrator's target date to begin service if it were the successful bidder would be October 1, 1994.

Wheelabrator's bid was premised on the availability of tax exempt municipal bonds. The consulting team assured Wheelabrator that such bonds would be made available for this project, but it later developed that that was not the case.

The consulting team reviewed Wheelabrator's bid and found that it passed the technical criteria. Application of the net present value formula to Wheelabrator's bid yielded a net present value of $128,141,129.50. That value was premised on the availability of the tax exempt bond.

## WAI'S PROPOSAL

WAI proposed to service the Berks County waste at the Delaware County Resource Recovery Facility in Chester, Delaware County, Pennsylvania. That facility will be operated by Westinghouse pursuant to a separate agreement between Westinghouse and Delaware County. The facility expects to have excess capacity after fulfilling the Delaware County obligations, and WAI planned to make use of that excess capacity to serve Berks County. Because the facility was already under construction when Berks County announced its RFP, WAI would be in a position to begin to dispose of Berks County trash several years before its competitors. WAI anticipated beginning service to Berks County in either late 1991 or early 1992.

The consulting team determined that WAI's proposal passed the technical criteria. The net present value formu-

la had already been adjusted to reflect a common assumed starting date for the bidders. Application of that formula to WAI's bid yielded a net present value of $122,251,061.84. Application of the net present value formula without the uniform starting date to WAI's bid would result in an increase in its net present value by 8 to 15 million dollars, a value higher than Wheelabrator's.

## POST–BID PROCEEDINGS

On August 29, 1990, the last day for bid responses, American Re–Fuel, WAI and Wheelabrator submitted sealed bids. That evening Calhoun Baker called WAI and expressed its concern that WAI's proposal stated that it treated changes to permit requirements related to final values in the federal NSPS environmental standards as changes in law.[8] The RFP was based on the assumption that the final federal standards would be as originally published and required bidders to treat those values as given.

WAI replied that it merely intended to treat as a change in law any *difference* between the final standards and the standards as originally published in the proposed regulations. WAI would only increase its contract price if different final standards made compliance with those standards more costly. Calhoun Baker asked WAI to explain that intention in writing to the County and WAI complied.[9]

On August 30, 1990, the consulting team met with the Commissioners and members of the Solid Waste Advisory Committee (SWAC), a group created to advise the Berks

8. The significance of the change in law treatment is that the RFP allowed bidders to pass on additional costs resulting from changes in law to the county. The cost of complying with the published NSPS standards could not be passed through to the County.

9. WAI's proposal contained the following statement with respect to the NSPS values:

The final values that will be promulgated in the NSPS in December 1990 are not known. We cannot price or agree to any values that are not known; therefore we require that the NSPS will be treated as a change in law.

Plaintiff's Exhibit F–1 p. 6–40.

County Commissioners on the selection of a waste disposal facility. Calhoun Baker presented the consulting team's report at the meeting and recommended awarding the contract to WAI. The meeting was adjourned until 1:30 p.m. on the following day when a vote was to be taken.

After the meeting some SWAC members complained that they were given insufficient time to review the pertinent materials and consider each proposal. One of those members also complained that he felt under pressure to recommend WAI.

Calhoun Baker called WAI and advised it that the selection of WAI's proposal was a "fait accompli." Calhoun Baker also arranged a luncheon meeting with WAI, two of the Commissioners, and some of the consulting team's members to be held just before the 1:30 p.m. meeting at which the vote was to be taken.

The meeting convened as scheduled on August 31, 1990, and Commissioner Reber asked if anyone wanted to address the Board. Wheelabrator took the floor and critiqued the WAI proposal and the consulting team's report. Principal among Wheelabrator's complaint was the fact that the use of a uniform starting date for the bidders when in fact WAI would begin operations several years before Wheelabrator resulted in an artificially low net present value. Wheelabrator also claimed that the WAI proposal's exceptions to technical requirements caused financial risk to the county and that this cost was not reflected in the net present value. WAI was not present at the meeting. The Commissioners voted to reject the recommendation of the consulting team and voted to accept Wheelabrator's proposal.[10]

## DISCUSSION

Stapleton raises these assignments of error for our review: 1) whether the trial court erred by holding that the county bidding requirements were not applicable to con-

10. The Department of Environmental Resources approved the Berks County plan and authorized the county to implement it. 21 Pa.B. 386 (1991).

tracts bid under the Act as a matter of law; 2) whether the court erred in concluding that Berks County elected to adopt competitive bidding in this procurement even if those procedures are not applicable as a matter of law; and 3) whether the procurement process actually used by Berks County violated Section 502(f) of the Act because it was not "fair, open and competitive." Because of our disposition of the first two issues, it will not be necessary for us to reach the third issue.

■ Stapleton's first assignment of error is that the trial court erred by ruling that the competitive bidding procedures of Section 1802 of the County Code (Code),[11] 16 P.S. § 1802, do not apply to this procurement. In support of this argument Stapleton cites *Harris v. Philadelphia,* 283 Pa. 496, 129 A. 460 (1925); *Whitemarsh Township Authority v. Finelli Brothers, Inc.,* 408 Pa. 373, 184 A.2d 512 (1962); and *McCloskey v. Independence Cablevision Corp.* 74 Pa.Commonwealth Ct. 435, 460 A.2d 1205 (1983), for the general proposition that the law prefers competitive bidding of public contracts. None of these cases, however, support the conclusion that Berks County was obligated to abide by Section 1802 of the Code when it solicited bids for waste disposal, and we decline to so hold now.

The reasoning of the *Harris* Court—that competitive bidding discourages favoritism and helps to guarantee that the public gets the most value for its money—is salutary. These same general purposes undoubtedly were on the minds of the legislators when they enacted the Municipal Waste Planning, Recycling and Waste Reduction Act directing that contracts be awarded pursuant to or on "fair, open and competitive process." Though the purposes are the same, it does not necessarily follow that the procedures used to achieve those purposes will be the same in every case.

Section 1802 of the Code provides for the general contracting procedures to be followed by counties within its

11. Act of August 9, 1955, P.L. 323, Section 1802, *as amended,* 16 P.S. § 1802.

scope. That section acknowledges, however, that some contracts are beyond its purview. For example, contracts for patented or copyrighted articles,[12] and contracts involving professional advice are excluded.[13] In such cases the special nature of the good or service excuses compliance with the strict bidding requirements. *Beharry, Washington County Reports, 1983–1985,* 116 Pa.Commonwealth Ct. 613, 544 A.2d 514 (1988), *petition for allowance of appeal granted sub nom. Petition of Beharry,* 522 Pa. 590, 561 A.2d 743, *Petition of Mascara,* 522 Pa. 591, 561 A.2d 743 (1989). These examples are offered to demonstrate that the legislature does not intend strict compliance with Section 1802 in every public contract case, and also to indicate what sort of contracts might warrant deviation from the general rules. We turn our attention now to the particular procurement at issue.

■ Berks County argues that the provision of Section 502(f) of the Act requires only that the bidding procedure be fair, open and competitive, rather than in complete technical compliance with general county bidding procedures. We agree.

Section 502(f) provides:

**(f) Financial factors.**—The plan shall describe the type, mix, size, expected cost and proposed methods of financing the facilities, recycling programs or waste reduction programs that are proposed for the processing and disposal of the municipal waste or source-separated recyclable materials that will be generated within the county's boundaries during the next ten years. For every proposed facility, recycling program or waste reduction program, the plan shall discuss all of the following:

(1) Explain in detail the reason for selecting such facility or program.

(2) Describe alternative facilities or programs, including, but not limited to, waste reduction, recycling, or resource

**12.** 16 P.S. § 1802(h)(3).

**13.** 16 P.S. § 1802(h)(5).

recovery facilities or programs, that were considered and provide reasonable assurances that the county utilized a fair, open and competitive process for selecting such facilities or programs from among alternatives which were suggested to the county.

(3) Evaluate the environmental, energy, life cycle cost, the costs of transportation to each facility considered and economic advantages and disadvantages of the proposed facility or program as well as the alternatives considered.

(4) Show that adequate provision for existing and reasonably anticipated future recycling has been made in designing the size of any proposed facility.

(5) Set forth a time schedule and program for planning, design, siting, construction and operation of each proposed facility or program.

The language of this entire subsection suggests that the counties are given some discretion in choosing among alternatives. Paragraph (1) requires a detailed explanation for choosing a particular facility or program; Paragraph (2) asks only for "reasonable assurances that the county utilized a fair, open and competitive process" for selecting among alternatives; Paragraph (3) requires an evaluation of various factors associated not only with the selected facility but also with the others considered. In particular this last paragraph asks for an evaluation of the "environmental energy, life cycle cost, costs of transportation to each facility considered and economic advantages and disadvantages" of each facility considered. We believe that this is strong evidence that the legislature recognized that the contracts the municipalities would be considering under this Act were far from routine and that a mechanical application of general contracting procedures may not be desirable. We therefore reject Stapleton's argument that Section 1802 of the County Code applies as a matter of law to contracts bid under the Act.[14]

14. Stapleton cites Section 1508(b) of the Act as further evidence of the legislature's intent to require competitive bidding. He completely misinterprets that subsection. The provision states:

■ Stapleton next argues that, even if Section 1802 does not apply to every contract bid under the Municipal Waste Planning, Recycling and Waste Reduction Act as a matter of law, it nevertheless applies in this case because the county voluntarily elected its procedures. Stapleton contends that the RFP manifests an intention to adopt those procedures by advising bidders that the contract will be awarded to the "most economic" bid.

In *American Totalisator Co., Inc. v. Seligman,* 489 Pa. 568, 414 A.2d 1037 (1980), the Pennsylvania Supreme Court held that even if a contract were for a service which could be exempt from competitive bidding requirements, those requirements will apply if the government unit seeking the bids indicated that the contract would be awarded to the lowest responsible bidder. The contract in question there was for a computerized lottery game and the successful bidder was defending its bid by arguing that the service was exempt from competitive bid requirements because it was a highly technical professional service. The Supreme Court declined to address the issue of exemption because the Commonwealth specifically adopted the competitive bidding requirements in the language of the request for proposal. The request for proposal in *American Totalisator* provided in part:

> (b) Options.—Each public agency subject to this section *may, at its discretion,* do any of the following:
> ....
> (3) Upon evaluation of bids opened for a public contract for goods, supplies, equipment, materials or printing, the agency shall identify the lowest responsible bidder. Where there is a tie for lowest responsible bidder, the agency shall consider, as one factor in determining to whom to award the contract, which of the bids provides for the greatest weight of recycled content in the goods, supplies, equipment, materials or printing, or such other measure of recycled content as may be set forth in the invitation for bids.

Section 1508(b) of the Act, 53 P.S. § 4000.1508(b) (emphasis supplied). Clearly, this provision merely allows an agency, which is procuring goods and services under the competitive bidding requirement of another statute, to prefer recycled products in the case of a tie between the lowest bidders. This provision is not mandatory as Stapleton suggests, nor does it have anything to do with how counties shall procure services for *waste disposal facilities.*

The bidders should understand that the criteria used in the selection process are both objective and subjective and that cost is not the only determining factor. Financial resources and the capability of the bidder, among other things, are taken into consideration in order for the contract to be awarded in conformity with the concept of the lowest responsible bidder.

*Id.*, 489 Pa. at 575, 414 A.2d at 1040.

In the case now before us, the County's RFP stated it would select the option that was "most economic," but also contained the following reservation:

2. *COUNTY'S RESERVATION OF RIGHTS*

THE ISSUANCE OF THIS RFP CONSTITUTES ONLY AN INVITATION TO SUBMIT PROPOSALS TO THE COUNTY. THE COUNTY RESERVES THE RIGHT TO DETERMINE, IN ITS SOLE AND ABSOLUTE DISCRETION, WHETHER ANY ASPECT OF THE PROPOSALS SATISFACTORILY MEETS THE CRITERIA ESTABLISHED IN THIS RFP, THE RIGHT TO SEEK CLARIFICATION FROM ANY CONTRACTOR OR CONTRACTORS SUBMITTING PROPOSALS, THE RIGHT TO NEGOTIATE WITH ANY CONTRACTOR OR CONTRACTORS SUBMITTING A PROPOSAL, AND THE RIGHT TO REJECT ANY OR ALL PROPOSALS WITH OR WITHOUT CAUSE. IN THE EVENT THAT THIS RFP IS WITHDRAWN BY THE COUNTY FOR ANY REASON, INCLUDING BUT NOT LIMITED TO THE FAILURE TO OCCUR OF ANY OF THOSE THINGS OR EVENTS SET FORTH HEREIN, THE COUNTY SHALL HAVE NO LIABILITY TO ANY CONTRACTOR FOR ANY COSTS OR EXPENSES INCURRED IN CONNECTION WITH THIS RFP OR OTHERWISE.

Plaintiff's Exhibit A p. 2.

We find *American Totalisator* indistinguishable from the case now before us. The record strongly shows that Berks County intended that all other things comparable, the bidder with the lowest cost would be awarded the contract.

First, in *American Totalisator* the Commonwealth announced the contract would be awarded to the "lowest responsible bidders;" in this case the County used the term "most economic." This is a distinction without a difference.

Second, in *American Totalisator,* the RFP stated that the selection criteria was both objective and subjective and that cost was not the only factor; in this case the County attempted to reserve to itself the right to seek clarification and to negotiate with a bidder. Our Supreme Court rejected this attempt to circumvent the lowest responsible bid concept in *American Totalisator* and held that such a process was void. In so doing the Court Said:

> Nevertheless, the chancellor did find that elementary principles of competitive bidding had been violated when Control Data was allowed to 'clarify' its bid after American Totalisator's bid had been opened. Before the clarification, Control Data's bid was higher than the bid of American Totalisator; yet, after the clarification the opposite was true. The evil of the instant procedure is readily apparent. When competitive bidding is used and the procedures followed emasculate the benefits of such bidding, we believe judicial intervention is proper.

*Id.,* 489 Pa. at 576, 414 A.2d at 1041. Berks County's attempt to reserve the right to have bids clarified and to negotiate with bidders after the bids were opened has no effect since our Supreme Court has rejected those procedures.

Third, the technical requirements of the contract were opened prior to the bids in *American Totalisator* leaving cost as the determining factor. Similarly, in this case the technical criteria were judged on a pass/fail basis. So the critical factors distinguishing all bids which passed the technical evaluation was cost.

Finally, it is clear from the testimony that everyone involved in this process, including the consulting team coordinator, Calhoun Baker, was operating under the assumption that the contract would be awarded to the lowest bidder. In fact, the RFP stated in its introductory paragraph that in the procurement process it was "developed in

accordance with the Commonwealth's competitive bid requirements," and requested responses in sealed envelopes returned by a specific date and time. Since the facts show that the County intended to award the waste disposal contract to the lowest bidder, it must abide by that decision. *American Totalisator.*

Stapleton complains that there were a number of problems with the bidding process which have weakened the safeguards that competitive bidding provide. Those problems are:

1. Commissioner Carabello met privately with Wheelabrator after the sealed bid submissions to discuss the bidding process and WAI bid.

2. Wheelabrator was allowed to submit a revised bid after the deadline for bids, and it included in that revision a criticism of WAI's bid.

3. Wheelabrator recalculated WAI's bid using WAI's actual anticipated starting date rather than the presumed date which the final RFP used. This means that the County was measuring WAI's bid against criteria which was different from the RFP.

4. WAI was given opportunity to respond to Wheelabrator's criticism.

5. The County openly negotiated additional terms with Wheelabrator during the meeting of August 31, 1990, after the bids were submitted.

6. No bid bonds or performance bonds were required by the County.

7. Wheelabrator made its Disposal Service Agreement "subject to mutual agreement on final language to resolve and commemorate the remaining open issues."

8. Wheelabrator made its bid premised on the availability of tax exempt municipal bonds which were in fact not available.

9. The RFP improperly allowed bidders to take exception to particular technical provisions if those exceptions were disclosed. Stapleton argues that common specifications are essential to a level playing field and that this is

the equivalent of negotiating with the bidders after the bids are opened.

■ We recognize that the procurement process for a complex contract such as the one negotiated in this case will necessitate some procedures which are not the norm. For this reason we do not find it objectionable that the county did not require bid or performance bonds in this case. The county used the RFP to limit participation to firms with substantial financial resources. This is a reasonable substitute means to secure performance and protect the county.

Beyond the financial considerations, the subject matter of the contract demands technological and environmental knowledge for a complete understanding of the proposals. Such knowledge is far beyond the expertise of even a well-informed layman, and for this reason the County's procurement team solicited and accepted modifications and criticisms of its RFP from the service providers participating in the process. These negotiations and changes which took place before the bids were opened seem to us an appropriate and necessary modification of the general procurement process.

■ The events which transpired after the bids were opened are another matter. Private meetings and negotiations with some bidders to the exclusion of others before the contract is awarded is precisely the sort of favoritism and unfair advantage that *Harris* and its progeny disdained.

When Wheelabrator complained to the Commissioners that the WAI bid used an "artificial" starting date and had additional hidden costs not reflected in the RFP, the playing field began to shift demonstrably in Wheelabrator's favor. When Wheelabrator was permitted to submit a recalculation of WAI's bid based on criteria different from the RFP's (i.e. WAI's anticipated starting date versus its presumed starting date) the field was at a full tilt. Wheelabrator was then awarded the contract. This process was not fair.

The County had hired a team of experts to assist in selecting a waste disposal facility. That team developed an RFP. The team determined that though the participants would have different actual starting dates, it would be necessary to presume their starting dates were the same so that a fair comparison could be made. There were other economic assumptions incorporated in the net present value algorithm, assumptions which like WAI's prescribed starting date may deviate from actual events, but which are nevertheless necessary for comparison purposes.[15] The bidders submitted their bids based on the Final RFP.

If the County determined that the process for developing the RFP or the RFP itself were flawed, it was certainly at liberty to reject the advice of its expert consultants. If it chooses to do so it must reject that advice and reform the process and RFP in a manner which does not favor one bidder over another. *American Totalisator*. This is where the County and the trial court have erred.

If the County wanted to reject the RFP it should have dismissed all bids, made the necessary corrections and invited new bids in accordance with the RFP which it endorsed.[16] In *American Totalisator*, the Supreme Court found that the bidding process was improper and that the contract awarded pursuant to that process was therefore void. The court refused, however, to award the contract to another bidder who purported to be the lowest responsible bidder because it reasoned that where the process was defective, it was more appropriate to order new bids. In the case now before us, we believe that rebidding is the only course possible since the County apparently believed that its own RFP was unsound.

It is no answer to the procedural problems found in this case to assert that WAI also engaged in improper negotiations with the County procurement team and that therefore

15. For example, an interest rate of 8% for the next 20 years and a 155,125 ton per year volume were assumed.

16. Section 1802(e) of the Code permits the Commissioners to reject all bids.

the contract award to Wheelabrator is proper. Proof of additional improprieties in the procurement process are only additional reasons to invalidate the process and the resulting RFP. This is, after all, a taxpayer's suit which alleges that the irregularities in the process defeated the safeguards that competitive bidding was designed to insure. We believe that the threat to the public fisc in this case was real and that the contract must be annulled and new bids submitted.

A party seeking a preliminary injunction must demonstrate that his right to relief is clear, his need to relief immediate, and that the injury he will suffer if the relief is not granted will be irreparable. *Willman.* In cases where public contract bidding irregularities are shown, it is proper for a reviewing court to enjoin the contract awarded according to those faulty procedures. *American Totalisator.* Stapleton has sufficiently established that the bidding process was irregular and that an injunction should be awarded.[17]

Because the trial court erred as a matter of law in concluding that the County did not elect to use competitive bidding procedures, its decision must be reversed.

BYER, J., did not participate in the decision in this case.

## ORDER

AND NOW, this 24th day of June, 1991, the order of the Court of Common Pleas of Berks County in the above-captioned matter is hereby reversed and the County is hereby enjoined from executing or performing on the waste disposal contract with Wheelabrator Pottstown, Inc.

17. Appellees also request that if Stapleton's request for relief is granted that he be directed to file appropriate security pursuant to Pa. R.A.P. 1733 in the amount of $34,000,000.00. We decline to order that such security be filed in this case because it would impose such a financial burden on taxpayers that it would discourage such actions. We note that the Official Note to Pa.R.A.P. 1733 gives us broad discretion in applying the rule.

Further, Appellees' Motion to Quash Appeal is hereby denied.