641 A.2d 698

Garnett L. **RAINEY**, Virginia W. **Gray**,
and Albert Cresson, Appellants,

v.

**BOROUGH OF DERRY**, Pugliano Construction
Company, and Ross & Kennedy Corporation.

Commonwealth Court of Pennsylvania.

Argued Nov. 19, 1993.

Decided April 27, 1994.

Charles W. Robinson, for appellants.

David C. Pohland, for appellee Borough of Derry and Pugliano Const. Co.

Michael G. Bock, for appellee Ross & Kennedy Corp.

Before CRAIG, President Judge, and McGINLEY, J., and NARICK, Senior Judge.

CRAIG, President Judge.

Garnett Rainey, Virginia Gray and Albert Cresson, taxpayers in the Borough of Derry and the appellants here (hereinafter, "the taxpayers") appeal from an order by Judge McCormick of the Court of Common Pleas of Westmoreland County denying their request for a preliminary and permanent injunction to enjoin the Borough of Derry from awarding a municipal contract to Pugliano Construction Company. The borough and Pugliano are the appellees. We are asked to determine whether the borough violated the competitive bidding process by conducting post-bid negotiations and waiving defects in Pugliano's bid. We affirm in part and reverse in part.

## HISTORY

The facts, as found by the trial court and as revealed by the record, are as follows. On February 1, 1993, the borough advertised for bids for the construction of public works called "Borough of Derry Sewage Treatment Plant Expansion, General/Mechanical Contract 1/93" (the contract).

On March 1, the borough opened bids for the project from, among others, Pugliano, Ross & Kennedy and Merit Contracting. Pugliano had the lowest base bid at $2,362,500.00 (the

initial bid). Merit Contracting had the second lowest base bid at $2,372,000.00. Pugliano's base bid therefore appeared to be $9,500.00 less than Merit Contracting's.

The next day, the engineer for the borough retabulated the bids to check for computational errors in the bid proposals. The project specifications require the base bid to be the sum of 50 itemized components of the contract. The engineer discovered a discrepancy in Pugliano's bid proposal: the 50 line items, when added together, produced a base-bid-figure of $2,145,800.00 (the corrected bid), i.e., a figure that is $216,-700.00 *less* than Pugliano's already low bid. Therefore, Pugliano's base bid appeared to be the lowest bid by a margin of $226,200.00. Ross & Kennedy's bid proposal also indicated a sum of the line items that differed from the base bid, but not enough to change its bidding position.

In addition, the engineer found that Pugliano failed to designate which equipment manufacturers, from a restricted list of approximately 50 borough-approved manufacturers, would supply equipment for 22 components of the project. Merit Contracting also failed to list one manufacturer in its bid proposal.

That day, March 2, the engineer telephoned Pugliano and Ross & Kennedy and informed those contractors of the discrepancies in their respective base bids. There is nothing in the record to indicate that the engineer contacted Merit Contracting. The engineer told the contractors that the borough considered the sum of the 50 line items to be the base bid. The engineer allowed the contractors 48 hours to confirm that the engineer's calculations for the respective base bids were in fact the contractors' bids, or to withdraw from the bidding process. The engineer also gave Pugliano until the close of business on March 2 to provide a completed list of manufacturers (the equipment list).

Pugliano responded by fax at 4:45 p.m. on March 2, confirming the corrected bid as its base bid and providing the requested equipment list. Ross & Kennedy withdrew its bid proposal. On March 8, at a regular meeting for the borough,

the engineer and the borough's solicitor discussed the bid defects above and decided to award the contract to Pugliano.

On March 26, the taxpayers filed petitions for preliminary and permanent injunctions in the trial court to prevent Pugliano from beginning work under the contract. The taxpayers alleged that the borough violated the competitive bidding rules at § 1402 of The Borough Code, Act of February 1, 1966, P.L. (1965) 1656, *as amended*, 53 P.S. §§ 45101–48501, and as found in the "Instructions to Bidders" at § 12 of the contract [1], by accepting a defective bid proposal, allowing additions to a bid proposal after the bid opening, and conducting post-bid negotiations.

The trial court conducted hearings on April 1 and 5, and the judge read his decision and order denying the injunctions into the record on the 5th. The judge stated the issues as follows:

I think it was proper for the calculation to take place to allow Pugliano to either affirm or withdraw their bid, based upon that calculation. ... [T]he point here is to insure that before the bid itself is accepted, that the process is fairly handled, and that the ... [borough's] engineering firm does their job. ... If the engineer had not gone through the calculation process here, [Pugliano] still would have, based on the front page total lump sum bid [the base bid], been the lowest bidder. So, there really wasn't any competitive advantage gained here. ... Now ... look at the failure to submit a designation of base bid equipment manufacturers with the bid originally ... [W]hen you take it in context, and in conjunction with the requirement that the designations must come ... from a restricted list that [is] provided [by the borough], then that admission doesn't rise to materiality at all in this instance, because it consti-

1. The taxpayers also assert that the borough violated certain competitive bidding rules that appear in "an act regulating the awarding and execution of certain public contacts; providing for contract provision relating to the retention, interest, and payment of funds payable under the contracts; and repealing inconsistent acts," Act of November 26, 1978, P.L. 1309, *as amended*, 73 P.S. §§ 1621–1631. However, this legislation is not pertinent to this appeal because it does not address waiver of bid defects but concerns timeliness of awarding contracts and payments.

tutes a matter to which the Borough, I believe, can waive a defect, and allow the post bid submission under the rationale of *McCloskey* [*v. Independence Cablevision Corp.,* 74 Pa. Commonwealth Ct. 435, 460 A.2d 1205 (1983) ] ... The overall considerations that Judge Crumlish pointed to in the McCloskey case have guided me in my determination here ... To me, no competitive advantage was gained in the process. They had one work day, less than one work day, if you look at the numbers on the faxes, the time numbers on the faxes, they had one work day in which to submit a list from a restricted list, and I think that that's significant here. What you're dealing with here is a situation in which, by restricting the list, the engineer, on behalf of the Borough, has already insured the quality of the manufactured item in that particular instance. ... So there was nowhere that Pugliano could have gone to shave the price here, if the price could have been shaved.

In addition, the trial court concluded that the taxpayers lack standing because the taxpayers appear to be bringing an injunctive action on behalf of Merit Contracting which lacks standing to sue because it is not a borough taxpayer.

The taxpayers filed an application in this court for an injunction pending appeal which this court denied. This court also denied the taxpayers' application for reargument, and the borough's motion to dismiss the taxpayers' appeal for mootness and to quash for lack of standing to appeal the trial court's order.

Presently the taxpayers ask that we reverse the decision of the trial court because the judge erred by deciding that the taxpayers lack standing to sue insofar as the judge believes they are nominal plaintiffs on behalf of Merit Contracting, by deciding that the borough and Pugliano did not violate the competitive bidding laws even though the borough waived mandatory bid requirements with which Pugliano's bid proposal does not comply, and by deciding that the borough and Pugliano did not enter into post-bid negotiations even though the engineer asked Pugliano to agree to a lower bid and enabled Pugliano to "bid-shop". We agree that the trial court

erred as to standing, but we otherwise agree with the decision of the trial court.[2]

## A. STANDING

█ This court has previously determined that the taxpayers have standing to sue the borough. In response to the borough's application before this court to dismiss and to quash for lack of standing, this court wrote the following, which we incorporate here:

> [U]nlike other jurisdictions which regard standing as a jurisdictional matter, the Commonwealth of Pennsylvania does not consider a party's standing to be a jurisdictional issue. *Coolbaugh Township Board of Supervisors v. Tiab Communications Corporation,* 147 Pa. Commonwealth Ct. 371, 607 A.2d 859 [ (1992) ]. Hence, unless a party specifically raises the issue in a timely manner, a court cannot raise the issue of standing. Id. In this case, at the beginning of the trial court's hearing, counsel for the borough, not only did not raise standing as an issue, but stated that he would stipulate as to the standing of one of the plaintiffs. Thus, the trial court apparently raised the issue on its own, and the borough, by not raising the issue at the hearing, apparently may have waived the issue. *Id.*

Moreover, this court disagrees with the trial court's conclusion that the plaintiffs do not have standing. In *Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 507 A.2d 323 (1986), the Pennsylvania Supreme Court, citing *Application of Biester,* 487 Pa. 438, 409 A.2d 848 (1979), noted that, generally, for a plaintiff to have taxpayer standing, he or she must establish, through their averments, an interest in the outcome of a lawsuit that surpasses the common interest of all taxpaying citizens. In order to surpass that common interest, a party must show that his

---

**2.** Our scope of review is limited to determining whether the trial court committed an error of law or made findings of fact that are unsupported by the record. *Municipal Authority of the City of Monongahela v. Carroll Township Authority,* 123 Pa. Commonwealth Ct. 615, 555 A.2d 264 (1989).

interest in the outcome is at least substantial, direct, and immediate.

However, the court in Consumer Party, citing Biester, noted that there is a narrow exception to the requirement that a taxpayer have the above-mentioned interest in the outcome of litigation. That exception provides that a taxpayer has standing, even if he does not establish a direct, substantial and immediate interest, if he can demonstrate that

1. the governmental action would otherwise go unchallenged;

2. those directly and immediately affected by the complained of expenditures are beneficially affected and not inclined to challenge the action;

3. judicial relief is appropriate;

4. redress through other channels is unavailable; and

5. no other persons are better situated to assert the claim.

510 Pa. at 170, 507 A.2d at 329.

In this case, all five requirements are present. As noted above, disappointed bidders generally do not have standing to challenge the bidding process. Therefore, the governmental action in this case would otherwise go unchallenged. The only entity that is directly and immediately affected by the award of the bid, other than the taxpayers, is the successful bidder, who is not likely to challenge the borough's action. Judicial relief is appropriate, if the taxpayers are successful on the merits. There is no other means of challenging the award. Finally, because disappointed bidders who are not taxpayers cannot challenge government action that improperly awards a contract to a particular bidder, taxpayers are in the best position to challenge bid award improprieties. *C.O. Falter Construction v. Towanda Municipal Authority*, 149 Pa. Commonwealth Ct. 74, 614 A.2d 328 (1992).

The fact that the plaintiffs did not exhibit a thorough comprehension or knowledge of the complaint does not

negate their interest. Certainly, one of the reasons that individuals retain legal counsel, rather than represent themselves, is that attorneys are professionally trained to know the law and to understand the legal basis for initiating a complaint. Plaintiffs need not investigate all the legal aspects of a claim before joining in the filing of a complaint. Although the attorney representing the plaintiffs in this matter had little or no contact with them before the trial court's hearing, he could properly draft a complaint averring the basic facts concerning the taxpayers' status and interest in the bidding process and the alleged problems with the bidding process. As indicated above, the plaintiffs' lack of knowledge of the precise legal basis for claiming that the borough had not followed the legal bidding process does not affect their standing. The plaintiffs' testimony indicates that they had a sufficient knowledge of the factual circumstances surrounding the bidding process, giving rise in them to a specific interest in the outcome of that process. *Rainey v. Borough of Derry* (No. 788 C.D.1993, filed August 11, 1993), slip op. at 4–7. Therefore, the taxpayers have standing to sue. Nonetheless, for the reasons that follow, we affirm the decision of the trial court because the taxpayers cannot prove that the borough violated the competitive bidding laws.

## B. WAIVER OF BID DEFECTS

[3] The taxpayers argue that the bidding rules required Pugliano to add correctly the 50 itemized components and accurately record the total on the first page of its bid proposal as the base bid. Furthermore, Pugliano had to submit the names of the equipment manufacturers it intended to use for the equipment list, and which it used for the purpose of calculating its base bid. According to the taxpayers, the borough's request to Pugliano that it agree to the lower base bid constitutes post-bid negotiating. Also, they contend that the request for the late equipment list is both post-bid negotiating and an allowance that may have permitted Pugliano to unfairly reap anticipated benefits from bid-shopping.

Initially, we note that competitive bid anomalies only rise to the level of requiring judicial intervention in limited circumstances. "When competitive bidding is used and the procedures followed emasculate the benefits of such bidding, we believe judicial intervention is proper." *American Totalisator Company v. Seligman*, 489 Pa. 568, 576, 414 A.2d 1037, 1041 (1980).

In this case the borough reserved the right to waive defects in the bidding process. "The right is reserved, as the interest of the Owner [the Borough of Derry] may require, to reject any and all bids, and/or to waive any informality in Bids received." Instructions to Bidders, § 2. Therefore, waiving a defect is not an automatic violation of the borough's competitive bidding rules. Instead, we must determine whether any defects waived by the borough caused the bidding process to become non-competitive.

> The determinative question then becomes whether, under the circumstances of this case, [these bid defects] are such an aberration from the bid specification as to violate the applicable statutory and city ordinance competitive-bidding requirements. If so, the irregularity in [the contractor's] bid would not be a mere informality waivable or correctable in the city's exercise of discretion; and the cases cited which deal with a court's interference with the discretion committed to public officials would be inapposite.

*Conduit and Foundation Corp. v. City of Philadelphia*, 41 Pa. Commonwealth Ct. 641, 401 A.2d 376 (1979) (citations omitted). We believe that under the facts of this case the borough did not violate competitive bidding practices by waiving the defects in Pugliano's bid proposal for the reasons that follow.

## 1. *Post–Bid Negotiations*

The taxpayers suggest that the borough's bidding rules require it to compare bid proposal figures based solely on the base bid listed on the first page of each contractor's bid proposal. The fact that Pugliano's initial bid did not correspond to the sum of the itemized bids is an error that may not be corrected after the bid opening, according to the taxpayers,

and it is a defect that violates at least an implied rule requiring accuracy in submitting bid proposals. Furthermore, the taxpayers seem to argue that the borough had no business in attempting to reconcile the disparate figures.

The taxpayers' argument is based on the premise that the borough is precluded from relying on the figures in Pugliano's itemized bid for purposes of comparing bid proposals. In support of this position the taxpayers refer to language in the bid proposal forms which read as follows:

*The following lump sum prices were used to compute the total Base Bid price set forth on page 1 of this Bid Proposal. Only the total Base Bid price will be used to evaluate the Bids.* Should the amount of any individual item be increased or decreased, the Bidder agrees that the following prices shall be used for all adjustments. The lump sum prices set forth on this page must equal the total Base Bid price set forth on the page 1 of this Bid Proposal. The prices set forth below under ALTERNATES are not to be used in computing the total Base Bid price (emphasis deleted). They will only be considered after the award of the Contract. For prices to be used under Base Bid, equipment used must be named in the Specifications, or approved by Addendum, as per Section 26 of the Instruction to Bidders.

Proposal to Derry Borough for Sewage Treatment Plant Expansion, General/Mechanical contract 1/93 (emphasis added).

According to the taxpayers, this language indicates that the borough must only refer to the base bid appearing on the first page of the bid proposals to compare bids. Because the borough here examined the itemized figures, calculated the corrected bid, and then asked Pugliano to agree to the corrected bid, the taxpayers suggest that the borough violated its own rules and negotiated with Pugliano.

We disagree with the taxpayers' interpretation of the language quoted above. That language relied upon by the taxpayers merely prevents the borough from awarding or rejecting this contract based on the price of particular line items

instead of the total base bid. However, there is nothing improper in the borough's action of correctly adding together the itemized prices to generate an accurate base bid. There is definitely no competitive advantage bestowed upon Pugliano by the borough's correcting Pugliano's math.

Furthermore, the borough's behavior is not negotiating. The borough knew after the bid opening that Pugliano appeared to be the low bidder. The borough also knew that the sum of Pugliano's itemized component prices generated a different base bid that was $216,700.00 less than Pugliano's already low bid. What the borough did *not* know, but what it had an obligation to its tax-paying residents to discover, was whether either base bid figure was accurate, and, if so, which one.

The language quoted above from the borough's bid proposal forms, indicates that the base bid figure is the product of the addition of the 50 itemized components. If Pugliano had asserted that its initial bid was its base bid, then its base bid would not have born any resemblance to the sum of the itemized figures contained within the bid proposal. However, Pugliano confirmed that the corrected bid, discovered by the borough, was its actual base bid. That figure equals the sum of the itemized components, and, therefore, must be used by the borough in comparing bid proposals if it is a reliable figure. Pugliano confirmed the lower figure's accuracy and the borough properly relied upon it in weighing the bid proposals.

### 2. *Bid–Shopping*

Nonetheless, the taxpayers believe that the borough provided a competitive advantage to Pugliano by waiving the equipment-list requirement at the time of the bid opening and then by allowing an additional 24 hours for compliance. Because Pugliano did not indicate which equipment manufacturers it would use in the bid proposal, i.e., Pugliano listed bid prices without "committing" to particular subcontractors, the taxpayers believe that Pugliano may have unfairly reserved the ability to negotiate new prices after the bid opening with

subcontractors. Although Merit Contracting omitted one manufacturer's name from its equipment list, the taxpayers argue that Pugliano was the only contractor which could take full advantage of this type of bid-shopping. Furthermore, because the record indicates that Pugliano officials knew of the equipment-list requirement and ignored it, the taxpayers suggest that Pugliano purposefully reduced its itemized bid prices so that it could be assured of winning apparent-low-bidder status.

The taxpayers also contend that a manufacturer that agrees to perform at the purposefully reduced bid prices may make corresponding reductions in the quality of its work. However, there is no such problem in this case. All contractors are required to select the equipment manufacturers from a list that was pre-approved by the borough and based upon each manufacturer's product quality. No one has argued here that Pugliano did not use manufacturers from the pre-approved list. Therefore, the quality of the work in this case is not at issue and the only advantage that could result from the borough's action is the possibility that Pugliano unfairly conducted bid-shopping without a corresponding loss in work quality.

This court addressed the issue of bid-shopping in *Conduit*. In that case, the apparent low bidder was the only party that listed alternative subcontractors for part of the work. This court held that the low bidder received an unfair advantage in that case because the low-bidder was the only party that had the opportunity to bid-shop. This court stated:

> [A] problem as to the statutory requirement of open and equal competition occurs because the benefits from bid-shopping can be anticipated when a bidder intends to list several suppliers. Therefore, those benefits can be factored into the amount quoted on the submitted bid, a benefit all the other bidders reasonably believed would not be permitted in this case.
>
> .    .    .    .    .
>
> *We are not holding that bid-shopping or the potential to bid-shop is necessarily against the public interest in every*

*case.* We simply conclude that where only one bidder, the lowest, has been left the potential to reap the benefits of bid-shopping, then it cannot be said that all the bidders competed on a fair and open basis.

41 Pa. Commonwealth Ct. at 646, 648–49, 401 A.2d at 379, 380 (emphasis added).

However, we do not believe that any competitive advantage inured to Pugliano from bid-shopping here because all contracting parties theoretically had an opportunity to bid-shop in this case. The taxpayers' argument concentrates on the 22 components of the equipment list without reference to the 28 "anonymous" components remaining on the itemized list. The remaining 28 components are anonymous in the sense that contractors are not obligated to specify which subcontractor will perform the relevant task associated with the itemized bids. Anonymous bids are always subject to bid-shopping pressures because eager subcontractors may offer their services to apparent low bidders in hopes of securing work from that contractor which has the best chance of winning the municipal contract.

However, there is no mechanism in place in this case to prevent any of the contractors from bid-shopping with regard to the anonymous contract components. Nor, as we have mentioned above, is there a per se rule against bid-shopping in municipal contracts.

If the borough had wanted to eliminate bid-shopping from this process—and there is no indication that the borough had any such intention—it could have simply required the contractors to specify all 50 subcontractors in the bid proposals rather than just 22. If a contractor has obligated itself in a bid proposal to a specific subcontractor, the type of bid-shopping pressures above are less likely to occur and, therefore, the contractor will be less likely to propose itemized prices made in anticipation of bid-shopping.

Because the borough did not impose such a rule, whether or not a contractor listed its 22 equipment manufacturers could not preclude the possibility that the contractor relied upon bid-shopping for the anonymous components in creating its bid

proposal. Therefore, despite the borough's request for specificity for 22 components of the contract, we will not penalize Pugliano and the borough in the name of preventing bid-shopping when all of the contractors theoretically had the same opportunity to bid-shop in this case.

Finally, the taxpayers contend that the trial court committed reversible error by relying on this court's decision in *McCloskey* despite the caveats specifically expressed in that case. In that case this court addressed the questions of whether a contractor's bid proposal that did not contain a completed "Form G" (which illustrates the contractor's financial strength) had to be rejected outright, and whether the contractor's late submission of the Form G constituted a substantive amendment to its bid. This court decided that the contractor's bid did not have to be rejected and ordered the contractor to submit the Form G belatedly.

However, the taxpayers maintain that the trial court could not base its decision upon the *McCloskey* decision because this court specifically limited that decision's precedential value with the following statement: "We cannot emphasize enough the unique character of this case, and we hold that under no circumstances (except a *precise* factual posture) is this precedential." 74 Pa. Commonwealth Ct. at 443, 460 A.2d at 1209 (emphasis in original). Therefore, the taxpayers assert that the trial court judge's stated reliance upon the *McCloskey* decision is an error of law and indicates a lack of legal authority for the trial court's decision.

Of course, all published opinions are precedential to some degree, as the *McCloskey* quote itself suggests. We believe that the trial court properly relied upon the legal theory underlying *McCloskey*. The language immediately following the above quoted material sets forth the fundamental policy consideration that the trial court correctly extracted from *McCloskey:*

In an area of law that demands meticulous attention to particular circumstance, the courts must weigh carefully the preservation of the competitive bidding process against the right of an individual to bid freely on public contacts. Only

when these two components are balanced properly will the public interest be best served.

*Id.* at 443–44, 460 A.2d at 1209.

We believe that the proper balance of these components in this case requires that the borough should be allowed to waive Pugliano's bid defects because they do not convey any competitive advantage to Pugliano under the facts before us.

Accordingly, although we reverse the trial court regarding the taxpayers' standing, we affirm the decision of the trial court insofar as it concluded that the borough did not violate the competitive bidding laws by conducting post-bid negotiations or by waiving bid defects and thereby conveying unfair competitive advantages to Pugliano.

## ORDER

NOW, April 27, 1994, the order of the Westmoreland County Common Pleas Court, dated April 5, 1993, No. 2280 of 1993, is reversed on the question of standing, but is otherwise affirmed.