Donald MARX, Appellant,

v.

LAKE LEHMAN SCHOOL DISTRICT
and Main Electric Supply and
Contracting, Inc.

Commonwealth Court of Pennsylvania.

Argued Dec. 3, 2002.
Decided March 3, 2003.

Edward T. DeLisle, Philadelphia, for appellant.

Arthur L. Piccone, Kingston, for appellees.

Before: FRIEDMAN, Judge, COHN, Judge, JIULIANTE, Senior Judge.

OPINION BY Judge COHN.

This is an appeal by Donald Marx, an adult individual and taxpayer, from an order of the Court of Common Pleas of Luzerne County that denied a motion for a temporary restraining order and preliminary injunction which Marx sought against the Lake Lehman School District (District) regarding a public bid award for electrical contracting work issued by the District to Main Electric and Supply Contracting, Inc. (Main).[1] We affirm.[2]

---

1. Originally, Cavanaugh Electrical Contracting (Cavanaugh) was also a party in this lawsuit. Prior to the preliminary injunction hearing, however, all counsel stipulated to the removal of Cavanaugh as a party to the action.

2. The trial court conducted a hearing on the motions and then directed the parties to submit proposed findings of fact and conclusions of law. They did so. Thereafter, the trial court adopted the proposed findings and conclusions submitted by the District and Main.

▪ The project that forms the basis of this litigation is an addition and renovation to Lake Lehman High School. The project was set up to request bids, and to award contracts to nine prime contractors, including one to handle electrical construction. After bids were requested and received, on October 16, 2001, the District voted to accept Main's low bid of $1,165,000 for the electrical portion of the contract. Main was notified of the award on October 17, 2001. After Main submitted a performance bond, upon which this dispute is based, the District, in a special meeting on December 4, 2001, voted to award the contract to it. Thereafter, Marx filed his equity action seeking a temporary restraining order and preliminary injunction, both of which the trial court denied.[3] This appeal followed.

▪ On appeal, Marx raises three arguments. First, he asserts that, as a taxpayer, he had the requisite standing to bring an action challenging the award of the bid to Main. Second, he asserts that Main failed to comply with the instructions to bidders by not providing the requisite performance bond in a timely manner. Third, he asserts that the District and its architect, Mr. Douglas Trumbower, failed to conduct an appropriate investigation into whether Main was a responsible bidder. We will consider these issues in this order, keeping in mind that our scope of review over a trial court's denial of a preliminary injunction is limited to determining if there existed any reasonable grounds for the action of the trial court or whether any rule of law it relied upon was erroneous or misapplied. *Stapleton v. Berks County*, 140 Pa.Cmwlth. 523, 593 A.2d 1323 (1991), *petition for allowance of appeal denied*, 529 Pa. 660, 604 A.2d 251 (1992).

## STANDING[4]

Regarding the question of standing, the trial court adopted the proposed conclusion that Marx lacked standing to prosecute this action because, although he was a taxpayer in the District, (1) he did not exhibit a thorough comprehension or knowledge of the complaint; (2) he testified that he had conducted no investigation into the proceedings except to speak with Mr. Joseph Cavanaugh, a competitor of Main; (3) he stated that he had no personal knowledge of any events that had occurred with respect to the proceeding; and (4) he also stated that he did not engage and was not paying the attorney he was using.

Essentially, what the District and Main are suggesting is that Marx is a "straw man" for Cavanaugh, an unsuccessful bidder for the electrical contract. Cavanaugh, as a competitor, is not permitted

We will take our recitation of the facts from those proposed by Main because they are more detailed than those submitted by the District.

3. It is well-settled that a court may grant a request for a preliminary injunction only where (1) the moving party demonstrates the relief is necessary to prevent immediate and irreparable harm which cannot be compensated for in damages, (2) greater injury will occur from refusing the injunction than granting it, (3) the injunction will restore the parties to the status quo as it existed immediately before the alleged wrongful conduct, (4) the alleged wrong is manifest and the injunction is reasonably suited to abate it and, (5) the plaintiff's right to relief is clear. *Lewis v. City of Harrisburg*, 158 Pa.Cmwlth. 318, 631 A.2d 807 (1993).

4. Based upon our reading of the proposed findings and the court's order, it appears that the trial court denied the preliminary injunction on the merits, but also ruled that Marx had no standing to bring the lawsuit. We, thus, examine this issue.

under the law to challenge a successful bidder.[5]

■ The courts have recognized that, because competitors are not granted standing in bidding award cases, the process relies upon taxpayers to bring actions such as this one. *Rainey v. Borough of Derry*, 163 Pa.Cmwlth. 606, 641 A.2d 698, 701 (1994). For this reason, the standing requirement is not an onerous one. And, in fact, the notion argued by Main and the District that, to possess standing, Marx must have a substantial, direct, and immediate interest in the matter, has been rejected in public bidding cases. *Id.* We, therefore, conclude that Marx, although he is unfamiliar with many of the details of this case, as a taxpayer, nonetheless, has demonstrated a sufficient interest in the matter to convey standing upon himself. Review of the record shows that Marx was in the construction business, had an interest in the integrity of the bidding process in general, although he had submitted no bid on this project, had read the newspaper regarding what occurred with the bidding and had spoken to the unsuccessful bidder, Joseph Cavanaugh, a long-time friend whose word he trusted. (N.T. 8–22.) Moreover, *Rainey*, cited by the District and Main for the proposition that Marx did not possess sufficient knowledge of the facts, is not *distinguishable*, but *applicable* since it clearly stated that knowledge of details is not necessary. As we wrote there:

> The fact that the plaintiffs did not exhibit a thorough comprehension or knowledge of the complaint does not negate their interest. Certainly, one of the reasons that individuals retain legal coun-

sel, rather than represent themselves, is that attorneys are professionally trained to know the law and to understand the legal basis for initiating a complaint. Plaintiffs need not investigate all the legal aspects of a claim before joining in the filing of a complaint. Although the attorney representing the plaintiffs in this matter had little or no contact with them before the trial court's hearing, he could properly draft a complaint averring the basic facts concerning the taxpayers' status and interest in the bidding process and the alleged problems with the bidding process. As indicated above, the plaintiffs' lack of knowledge of the precise legal basis for claiming that the borough had not followed the legal bidding process does not affect their standing. The plaintiffs' testimony indicates that they had a sufficient knowledge of the factual circumstances surrounding the bidding process, giving rise in them to a specific interest in the outcome of that process.

*Id.* at 701.

We, thus, conclude that the trial court erred to the extent it suggested that Marx should not be granted standing.

## COMPLIANCE WITH INSTRUCTIONS TO BIDDERS

We now consider whether the fact that the District failed to follow Article 9, Section 1.a of the Instructions to Bidders, which specifies that a performance bond be delivered no later than 10 days after execution of the contract, was a basis to set the award aside, or whether there was conflict in the bidding documents regarding this requirement. A different compa-

---

**5.** *Rainey v. Borough of Derry,* 163 Pa.Cmwlth. 606, 641 A.2d 698 (1994). This is to be distinguished from Section 1711(a) of the Commonwealth Procurement Code, 62 Pa. C.S. § 1711(a), which does grant, inter alia, a competitor standing to file a protest if he is "aggrieved in connection with the solicitation or award of a contract...." This bid was not issued under the Commonwealth Procurement Code.

ny than that which issued the bid bond issued the performance bond for Main, and the bond was not issued within 10 days of contract execution, although there was evidence, within that time, that the bond would be furnished.

The trial court found that, as required by Article 4 of the notice to Bidders, Main submitted a bid bond issued by Harleysville Mutual Insurance Company (Harleysville), for 10 percent of its bid amount. It was executed by Janine Heck of Eastern Insurance on behalf of Harleysville. Prior to the submittal of the bid, Harleysville maintained a bonding limit of $500,000 for Main. However, Frank Dreifuss, insurance manager of Harleysville, testified that the company had made an exception for Main, and had approved a larger job for $600,000. Furthermore, Dreifuss never informed Main that it could not bid a job over $600,000, and never advised Main that it would not bond any job over that amount. In fact, on October 9, 2001, Dreifuss forwarded correspondence to Heck advising her that she was authorized to execute a bid bond for the Lake Lehman School District project and the correspondence did not make any mention about limiting the issuance of the bid bond to a bid no greater than $600,000. Accordingly, the court found that Heck had the authority to execute the bid bond ultimately provided to the District. In fact, she had execution authority for a bond for 10 percent above the power of attorney authorization of one million dollars specified in documentation attached to the bid bond.

Although the bid bond was issued by Harleysville, that company did not issue a performance bond in conjunction with the project because the amount exceeded Main's $600,000 bonding limits. Instead, the performance bond was issued by ACSTAR Insurance Company (ACSTAR).[6] As a condition to issuing the performance bond, however, ACSTAR requested that the District and Main execute a Funds Administration Agreement.[7] At a December 4, 2001 special meeting, the Lake Lehman School Board voted to authorize the execution of the Funds Administration Agreement requested by ACSTAR.

The court further found that Mr. Trumbower served as architect for the District with respect to the project. He testified extensively on its behalf. He stated that the bidding documents were conflicting as to the time by which the performance bond needed to be supplied and, therefore, in his view, as long as the District had evidence presented to it that a performance bond would be provided, the time period within which the bond was to be supplied was discretionary. Specifically, Article 9 of the Instruction to Bidders provided that a successful bidder deliver the required bond to the District prior to the beginning of construction activity, but not later than 10 days after execution of the contract. In contrast, Section 11.5.1.1 of the general conditions and supplementary conditions for the project provided that:

> The Contractor shall deliver the required bonds to the Owner not later than ten (10) days following the date the

---

**6.** Heck testified that she was apprised that Harleysville would not issue a performance bond, although it was contractually obligated to do so since it had issued the bid bond. It was she who approached ACSTAR to issue the performance bond, instead of demanding that Harleysville issue its performance bond, because it was her responsibility to make sure that Main had a performance bond in place.

**7.** A Funds Administration Agreement is essentially one where the District would make payment directly to ACSTAR, who would then disburse the funds to the parties that had to be paid.

Agreement is entered into, or if the Work is to be commenced prior thereto in response to a letter of intent, the Contractor shall, prior to the commencement of the Work, submit evidence satisfactory to the Owner that such bonds will be furnished.

(N.T. 135, Exhibit D–3.) The project specifications further provided that if, after **30 days,** the bidder fails to execute a contract and bond, the bid bond shall be forfeited to the owner as liquidated damages. The court found that it was this forfeiture provision, as well as Section 11.5.1.1 of the Instruction to Bidders, upon which Trumbower relied when opining that the successful bidder would have a discretionary period of time in which to submit the performance bond.

The trial court also found, alternatively, that, even assuming Main were required to submit a performance bond within 10 days of the execution of the contract, it complied with this provision because the parties executed the contract on November 8, 2001 and Trumbower testified that, on November 13, Main advised the District that ACSTAR had requested the execution of a Funds Administration Agreement. The District minutes reflect a discussion relative to that agreement occurring on November 20, 2001.

■ Preliminarily, we note that competitive bidding serves to enhance competition which, in turn, encourages offering services at the best price. *Gaeta v. Ridley School District,* 567 Pa. 500, 501, n. 8, 788 A.2d 363, 367 n. 8 (2002). Thus, it is important that the bidding process foster confidence among potential bidders that their bids will be considered fairly and that they will not be denied a substantial benefit afforded to their competitors. *Id.* Main argues that the bid was compliant and that, if not, the non-compliance could be accepted or cured. The Supreme Court

has recently analyzed this issue, stating that there are two conditions that are widely accepted in determining whether a non-compliant bid may be accepted or cured:

> , First, whether the effect of a waiver would be to deprive the municipality of its assurances that the contract will be entered into, performed and guaranteed according to its specified requirements, and second, whether it is of such nature that its waiver would adversely affect competitive bidding by placing a bidder in a position of advantage over other bidders or by otherwise undermining the necessary standard of competition.

*Gaeta,* 567 Pa. at 508, 788 A.2d at 367–68; *see also Cardiac Science, Inc. v. Department of General Services,* 808 A.2d 1029 (Pa.Cmwlth.2002) (applying this standard to what is colloquially known as the Commonwealth Procurement Code, 62 Pa.C.S. §§ 1711–1751).

The court found that Trumbower believed that a performance bond was going to be issued because Main had obtained a bid bond. Had one not been issued, Harleysville would have been liable on the bid bond. *See* footnote 6. For this reason, Trumbower felt assured that the contract could and would be performed and so permitted the work to start. Additionally, the court found that Trumbower's interpretation of Section 11.5.1.1 and the general conditions and supplementary conditions for the project was uniformly applied to all contractors working on the project.

■ It is arguable that, under the District's interpretation of the forfeiture provisions and Section 11.5.1.1, the performance bond was not untimely. Even if the performance bond was late, however, the facts, as found, demonstrate that the *Gaeta* conditions were met.

In *Gaeta*, the defect was a failure by the successful bidder to submit a bid bond that met the advertised surety quality rating. The court stated that because (1) the school district had discretion to waive defects, (2) the contractor when requested furnished a bond with the required rating, (3) the surety rating was not material to the bid, and (4) the defect did not give the successful bidder a competitive advantage, the school district was not obligated to reject the bid. Terms which the court found would likely not be permitted to be overlooked were price discrepancies, a failure to bid on all necessary terms, omission of cost or performance items, and **defects related to the performance bond.**

We read the emphasized language as referring to defects in the **substance** of the performance bond, not as to a change in which insurance company will provide it. Additionally, here, we note that, due to the ambiguities in the bid document and confusion engendered by Harleysville's latent decision to refuse to issue a performance bond, Main's confusion was legitimate and innocent.

By accepting Main's late performance bond, the municipality was not deprived of its assurances that the contract would be performed and guaranteed. In fact, allowing Main to use ACSTAR rather than Harleysville *benefited* the District because utilization of a Funds Administration Agreement insures proper payment in accordance with the contract. Further, because the events complained about happened *after* the bidding was complete, and because the evidence supports the conclusion that any violation here was innocent and was premised upon the ambiguous bid documents and the refusal of Harleysville to issue a performance bond, it is clear, on these facts, that the waiver of the ten-day requirement by the District could not have affected competitive bidding occurring

much earlier. Therefore, the spirit of competitive bidding was not violated and the award need not be set aside on this basis. We, thus, conclude that the failure to comply with all instruction in the bid documents did not require that the bid be set aside.

## MAIN AS A RESPONSIBLE BIDDER

▮ Finally, we examine the question of whether the District failed to investigate sufficiently whether Main was a responsible bidder. We begin by noting that, in reviewing a public contract award, deference is afforded to governmental decision makers. *Gaeta.* As Judge Friedman, quoting from case law stretching back to 1931, recently wrote:

[T]he courts have uniformly held that the question of who is the lowest responsible bidder is one for the sound discretion of the proper municipal authority, and does not necessarily mean the one whose bid on its face is lowest in dollars, but includes financial responsibility, also integrity, efficiency, industry, experience, promptness, and ability to successfully carry out the particular undertaking, and that a bond will not supply the lack of these characteristics....

*Kierski v. Township of Robinson*, 810 A.2d 196, 199 (Pa.Cmwlth.2002).

▮ In the case *sub judice*, the findings indicate that Trumbower believed that Main was able to perform the electrical portion of the project based on a $120,000 job it had completed within 90 days prior to this bid. Additionally, he believed that Main had, in the previous three years, completed aggregate jobs averaging $800,000 per year and had done work for Wilkes College, Luzerne County Community College, the Army Corps of Engineers and the Airport Authority. He also took into account his knowledge, information and experience in the bidding process and

had no doubt as to Main's financial responsibility, or the integrity of the company and its ability to carry out the job successfully. We conclude that the findings, for which there is support in the record, sustain the conclusion that a sufficient investigation was performed. While there may have been some evidence to the contrary, it was within the purview of the trial court to reconcile any credibility matters. *Fraternal Order of Police Lodge No. 5 v. City of Philadelphia*, 139 Pa.Cmwlth. 256, 590 A.2d 384 (1991), *appeal dismissed*, 534 Pa. 301, 632 A.2d 873 (1993).

## CONCLUSION

In summary, we conclude that there were reasonable grounds for the trial court's determination to deny the requested relief.[8]

Based on the foregoing discussion, the order of the trial court is affirmed.

## ***ORDER***

**NOW,** March 3, 2003, the order of the Court of Common Pleas of Luzerne County in the above-captioned matter is hereby affirmed.

8. In addition to the evidence already discussed, the court also found that the project is one that is time sensitive, the building is 50 to 60 years old, and housed seventh and eighth grade students who needed to be temporarily relocated. Any significant time delay would create havoc. For example, it was necessary that, by September 1, 2002, certain classrooms be completed so that certain high school children could be moved into them. In addition, beginning in June 2002, the District had an asbestos removal program in portions of the senior high school that needed to start. That project had a narrow time frame so renovations elsewhere could be accomplished. If the District had been required to remove Main or any other major contractor and insert someone else it would have

Dissenting Opinion by Judge FRIEDMAN.

I respectfully dissent. I do not agree that Donald Marx (Marx) has standing to seek a temporary restraining order and preliminary injunction against the Lake Lehman School District (School District) to enjoin the School District's public bid award to Main Electric Supply Contracting, Inc. (Main Electric) for electrical contracting work.

### I. Traditional Standing

The purpose of the requirement of standing is to protect against improper plaintiffs. *Application of Biester*, 487 Pa. 438, 409 A.2d 848 (1979). To meet the standing requirement, a plaintiff must allege and prove an interest in the outcome of the suit which surpasses the common interest of all citizens in procuring obedience to the law. *Id.* To surpass the common interest, the plaintiff's interest must be substantial, direct and immediate.[1] *Id.* (citing *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975)).

Here, Marx testified that he is a taxpayer who resides in the School District and a heating and air conditioning contractor. (R.R. at 61a.) When asked why he agreed

caused a substantial problem and disruption in the relations with utility companies.

1. The requirement of a "substantial" interest simply means that there must be some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law. *Wm. Penn Parking Garage, Inc. v. City of Pittsburgh*, 464 Pa. 168, 346 A.2d 269 (1975). The requirement that an interest be "direct" simply means that the person claiming to be aggrieved must show causation of the harm to his interest by the matter of which he complains. *Id.* The requirement of an "immediate" interest means that there must be a sufficiently close causal connection between the challenged action and the asserted injury. *Id.*

to allow this lawsuit to be brought in his name, Marx replied, "Well, I bid school work and all the other work and I like to see that it's fair, that everybody bid apples for apples and bid according to specifications." (R.R. at 61a.) On cross-examination, Marx testified as follows:

> Q. Do you have any interest in the outcome of this other than [as] a taxpayer like anyone else in [the School District]?
>
> A. No, sir.

(R.R. at 63a.) Thus, Marx admitted that he does not have a substantial, direct and immediate interest which surpasses the common interest of all citizens.

Of course, as a taxpayer, Marx's interest in the outcome of this litigation is not necessarily substantial, direct and immediate. Our supreme court has stated that an interest in preventing a waste of tax revenue "is not immediate because the detriment to the taxpayer is too remote since he is not directly or specially affected by the loss." *Biester,* 487 Pa. at 444, 409 A.2d at 851. In similar fashion, this court has stated that a taxpayer's interest in "protecting the integrity of the competitive bidding process ... is too remote to grant [the taxpayer] standing [and] ... the threat of future noncompliance with bid specifications cannot be a basis to grant standing [to the taxpayer]." *Boady v. Philadelphia Municipal Authority,* 699 A.2d 1358, 1361 n. 1 (Pa.Cmwlth.1997).

## II. Narrow Exception

There is a narrow exception to the requirement that a taxpayer have a substantial, direct and immediate interest in the outcome of the litigation. *Biester; Rainey v. Borough of Derry,* 163 Pa.Cmwlth. 606, 641 A.2d 698 (1994). A taxpayer without a substantial, direct and immediate interest may have standing *if the taxpayer can demonstrate* that: (1) the governmental action otherwise would go unchallenged; (2) those directly and immediately affected by the complained of expenditures are beneficially affected and not inclined to challenge the action; (3) judicial relief is appropriate; (4) redress through other channels is unavailable; and (5) no other persons are better situated to assert the claim.[2] *Id.*

Here, Marx's testimony does not address any of these elements. Thus, I cannot conclude that Marx met his burden of proving that he falls within this narrow exception. Inexplicably, the majority does not address the requirements for taxpayer standing set forth in *Biester.* The majority simply concludes that Marx has standing as a taxpayer. (Majority op. at 1245.)

## III. Sufficient Knowledge

In *Rainey,* having concluded that the taxpayers met the *Biester* requirements, this court considered whether a taxpayer's interest is negated by the lack of a thorough comprehension or knowledge of the complaint. This court stated that taxpayers need not understand the *legal* basis for the complaint. *Rainey.* However, this court did require that taxpayers have "a sufficient knowledge of the *factual* circumstances surrounding the bidding process, giving rise in them to a specific interest in

---

**2.** With respect to the fifth element, this court stated that, because "disappointed bidders who are not taxpayers" cannot challenge bid awards, taxpayers are in the best position to challenge bid awards. *Rainey* 641 A.2d at 701. I believe that, in making this statement, this court suggests that disappointed bidders who also are taxpayers are better situated than other taxpayers to challenge bid awards. *See Lutz Appellate Printers, Inc. v. Department of Property and Supplies,* 472 Pa. 28, 370 A.2d 1210 (1977) (holding that a taxpayer who is also a disappointed bidder has standing to challenge a bid award).

the outcome of that process." *Rainey*, 641 A.2d at 701 (emphasis added).

Here, Marx testified that the bidding process was improper because Main Electric failed to file a proper *bid* bond. (R.R. at 64a.) However, when Marx was shown a copy of Main Electric's bid bond, Marx testified, "I think *he* was talking about the *performance* bond." (R.R. at 64a) (emphasis added). Marx was referring to Joseph Cavanaugh, a disappointed bidder who asked Marx to challenge the bid award and who hired and paid for Marx's attorney. (R.R. at 63a–64a.) Marx never discussed this case with the attorney; Marx never read any document filed by the attorney; Marx simply signed the verification that Cavanaugh brought to him. (R.R. at 64a.) I would conclude that Marx's lack of knowledge about the *facts* surrounding the bidding process negates any interest Marx might have had as a taxpayer in this matter.[3] *Rainey*.

Unlike the majority, I would conclude that the trial court properly determined that Marx lacks standing. Therefore, the trial court erred in addressing the merits of this case. Accordingly, I would vacate the trial court's order and remand for dismissal of the action for lack of standing.

---

**3.** The majority interprets *Rainey* to mean that "knowledge of details is not necessary." (Majority op. at 4.) However, *Rainey* makes a clear distinction between a taxpayer's knowledge of *legal* details and a taxpayer's knowledge of *factual* details. Here, in providing an erroneous basis for his challenge, Marx's testimony displays an unpardonable lack of knowledge of the factual details of this case, thereby depriving him of any standing he might otherwise claim. *Rainey*.