IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Gateway Health Plan, Inc. d/b/a Highmark Wholecare, | : | **CONSOLIDATED CASES** |
| | : | |
| Petitioner | : | |
| | : | |
| v. | : No. 147 C.D. 2025 | |
| | : No. 526 C.D. 2025 | |
| Department of Human Services, | : Argued: October 9, 2025 | |
| | : | |
| Respondent | : | |

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE LORI A. DUMAS, Judge
               HONORABLE STACY WALLACE, Judge


OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE WOJCIK                         FILED:  April 2, 2026


        In these consolidated appeals, Gateway Health Plan, Inc. d/b/a Highmark Wholecare (Highmark) petitions for review of two final determinations of the Designee (Designee) for the Secretary of the Pennsylvania Department of Human Services (DHS), dated January 21, 2025, and April 14, 2025 (Determinations), denying Highmark's bid protests related to the Request for Application No. 31-22 (RFA) for the Community HealthChoices (CHC) managed care procurement and associated award. Highmark challenges the integrity and legality of DHS's procurement process and claims that DHS failed to follow the law and solicitation requirements. After careful review, we reverse the Determinations and cancel the award of the RFA.

# I. Background

On January 30, 2024, DHS, through its Bureau of Procurement and Contract Management, issued the RFA seeking applications from Managed Care Organizations (MCOs) to administer the CHC program in five geographic zones (Northeast, Southeast, Lehigh-Capital, Northwest, and Southwest), which cover all 67 counties within the Commonwealth. Reproduced Record (R.R.) at 38a-86a; *see id*. at 43a-44a (Map). The CHC program is Pennsylvania's mandatory managed care program for individuals receiving both Medicare and Medicaid, known as Medical Assistance (MA) in Pennsylvania, and individuals who qualify for MA long-term services and supports. *Id*. at 18a. The CHC program provides assistance to eligible individuals by providing home and community-based waiver services or nursing facility services. *Id*.

The deadline to receive applications was initially March 15, 2024, but was extended to April 1, 2024. The RFA anticipated awarding contracts to no fewer than three and no more than five applicants in each zone. Applicants were permitted to submit an application for one or more zones, provided that the applicant submitted "zone-specific technical and [Contractor Partnership Program (CPP)] information in separate tabs and separate [Small Diverse Business (SDB)] and [Veteran Business Enterprise (VBE)] Submittals by zone . . . ." R.R. at 46a.

The RFA provided four mandatory, nonwaivable responsiveness requirements. Specifically, to be eligible for selection, applications were required to be (1) timely received, (2) properly signed, (3) contain a compliant SDB submittal, and (4) contain a compliant VBE submittal. R.R. at 58a. The RFA provided that DHS could "(1) waive any other technical or immaterial nonconformities in an

2

Applicant's application, (2) allow the Applicant to cure the nonconformity, or (3) consider the nonconformity in the scoring of the application." *Id*.

To be considered responsible and, thus, eligible for selection for negotiations, applicants' technical submittals were required to achieve a total raw score of greater than or equal to 75% of the available raw technical points. R.R. at 59a. Each applicant was also required to demonstrate that it "possesses the financial capability for the good faith performance of the Agreement." *Id*. The RFA stated that the Technical Criterion was assigned 100% of the total points based on four evaluation factors: (1) Soundness of Approach, (2) Applicant Qualifications, (3) Personnel Qualifications, and (4) Understanding the Project. *Id*. at 58a-59a.

The RFA provided that the Issuing Office would combine the evaluation committee's final technical scores, rank responsible Applicants by zone according to their total overall score assigned to each in descending order, and select for negotiations for each zone the applicants with the highest overall score. R.R. at 60a-61a. The scoring involves a formula giving the highest raw score full points and scaling others accordingly. *Id*. After selection for negotiations, DHS would notify all applicants in writing of the selected applicants. *Id*. at 55a. The RFA provided that applicants not selected could request a debriefing upon notification of non-selection. *Id*. at 55a-56a.

On March 29, 2024, Highmark submitted an application for all five zones. Seven other applicants also applied for all regions, including Pennsylvania Health and Wellness, Inc. (PHW), UPMC for You, Inc. (UPMCFY), Health Partners Plans (Health Partners), Aetna Better Health of Pennsylvania, Inc. (Aetna), and Vista Health Plan, Inc. (Vista) (collectively, Selected Applicants), which were ultimately selected by DHS for award negotiations, and UnitedHealthcare of Pennsylvania, Inc.

3

(United)[1] and Geisinger Health Plan (Geisinger),[2] which were not selected.  *See* R.R. at 311a.

After opening applications, DHS determined that it was unable to open portions of two applications for technical reasons.  DHS considered the applications as technically nonconforming and allowed the affected applicants – Aetna and Vista -- to resubmit those portions of the applications that were inaccessible.  Both applicants resubmitted the nonconforming portions along with declarations that the contents contained therein were unchanged except for technical modifications to enable DHS to open the documents.

On August 19, 2024, Eric McCoy (McCoy), the RFA's Issuing Officer, sent a Recommendation for Grantee Selection (Recommendation Memo) to DHS advising that the evaluation was complete and recommending five applicants for agreement negotiations based on overall scoring.  R.R. at 308a-15a.  Specifically:

| *Applicant* | *Technical Score: Northeast* | *Technical Score: Northwest* | *Technical Score: Lehigh/ Capital* | *Technical Score: Southeast* | *Technical Score: Southwest* |
|---|---|---|---|---|---|
| Aetna Better Health, Inc. | 909.6 | 909.6 | 909.6 | 909.6 | 909.6 |
| Geisinger Health Plan | 891.25 | 891.25 | 891.25 | 891.25 | 891.25 |
| Health Partners Plans, Inc. | 926.90 | 926.90 | 926.90 | 926.90 | 926.90 |
| Highmark Wholecare, Inc. | 886.63 | 886.63 | 886.63 | 886.63 | 886.63 |

---

[1] United filed the appeal at *United Healthcare of Pennsylvania, Inc. v. Department of Human Services* (Pa. Cmwlth., Docket No. 178 C.D. 2025), which was argued seriately with, and decided on the same day as, this case.

[2] It does not appear that Geisinger filed a protest; Geisinger has not intervened in this appeal.

| | | | | | |
|---|---|---|---|---|---|
| PA Health & Wellness, Inc. | 995.72 | 995.72 | 995.72 | 995.72 | 995.72 |
| UnitedHealthcare of Pennsylvania, Inc. | 868.41 | 868.41 | 868.41 | 868.41 | 868.41 |
| UPMC For You, Inc. | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |
| Vista Health Plan, Inc. | 948.97 | 948.97 | 948.97 | 948.97 | 948.97 |
| *Applicants NOT meeting 75% Technical Threshold* | | | | | |
| N/A | N/A | N/A | N/A | N/A | N/A |

*Id*. at 311a. On August 21, 2024, DHS notified Highmark that it was not selected for negotiations in any zone. *Id*. at 20a-21a.

The next day, Highmark requested a debriefing, as permitted under the RFA and Procurement Handbook. R.R. at 23a-24a. On August 28, 2024, Highmark timely filed its initial bid protest with DHS, alleging the evaluation was flawed and unlawful. Between September and December of 2024, Highmark filed three supplemental protests based on new information obtained through Right-to-Know Law (RTKL)[3] requests. DHS and Selected Applicants responded to each.

DHS Secretary appointed the Financial Policy Advisor of DHS's Office of Budget to serve as Designee to evaluate and render final determinations on Highmark's protests. *See* Section 1711.1(e) of the Commonwealth Procurement Code (Procurement Code), 62 Pa. C.S. §1711.1(e) ("The head of the purchasing agency or his designee shall review the protest and any response or reply . . . ."). Designee consolidated the four protests for review and, ultimately, denied them by first determination dated January 21, 2025 (First Determination). Designee reasoned that Highmark failed to carry its heavy burden to overcome the presumption that

---

[3] Act of February 14, 2008, P.L. 6, 65 P.S. §§67.101-67.3104.

DHS acted in good faith. First Determination, 1/21/25, at 12-13. Designee found that DHS selected applicants in accordance with the RFA. *Id*. at 13-22. Designee relied on two sworn declarations from McCoy (McCoy Declarations) that the evaluation criteria were established before the applications were opened and that each zone was separately evaluated and scored. *Id.*; *see* R.R. at 297a-99a, 623a-24a.

On February 5, 2025, DHS provided a debriefing explaining the strengths and weaknesses of Highmark's application. R.R. at 782a-87a. Under Soundness of Approach, DHS identified 12 subcategories that were considered. *Id*. Based on the debriefing, on February 12, 2025, Highmark filed another protest, which Designee denied by second determination dated April 14, 2025 (Second Determination). Highmark timely appealed both Determinations, which we consolidated for review. Each of the Selected Applicants and United have intervened and filed briefs.[4]

## II. Issues

In this appeal, Highmark argues that the Determinations denying Highmark's protests were arbitrary and capricious, an abuse of discretion, and/or contrary to law for the following reasons. First, Highmark contends that DHS failed to fix or finalize the relative weights of the evaluation factors and criteria prior to the opening of Applications as required by the Procurement Code[5] and the Procurement Handbook.[6] Second, Highmark asserts that DHS failed to disclose the

---

[4] Selected Applicants align with DHS; United aligns with Highmark.

[5] 62 Pa. C.S. §§101-2311.

[6] The Procurement Handbook is available online at https://www.pa.gov/agencies/dgs/procurement-resources/procurement-handbook (last visited April 1, 2026).

relative weights of the evaluation factors and criteria at any time, which deprived Highmark of a "Fair Competition" as required by the Procurement Handbook. Third, DHS failed to evaluate the applications separately by zone, according to zone-specific criteria, as required by the RFA. Fourth, it claims that DHS's failure to provide a debriefing, required under Section I-24 of the RFA and Part 1, Chapter 6(B)(14) of the Procurement Handbook, until after Designee issued the First Determination rejecting all of Highmark's pending protest grounds, was a violation of Highmark's rights under the Procurement Code. Fifth, Highmark maintains that DHS accepted late, incomplete, and nonconforming Applications from Aetna and Vista in violation of the RFA and law. Finally, Highmark contends that DHS failed to produce relevant documents, namely, workbooks and training materials sent to the evaluation committee, which were referenced in the McCoy Declarations and relied upon in denying Highmark's protests. We begin our review by examining whether DHS evaluated the applications separately by zone, according to zone-specific criteria, as required by the RFA.

### III. Discussion
### A. Failure to Evaluate by Zone
### 1. Contentions

Highmark, joined by United, argues that DHS's evaluation of the applications was arbitrary, capricious, and contrary to law because DHS failed to evaluate the applications separately by zone, according to zone-specific criteria, as required by the RFA. The RFA required zone-specific evaluations due to demographic and geographic differences. All applicants received identical scores across all five zones. R.R. at 311a. Highmark and United argue that such scoring is statistically implausible and infers that DHS did not conduct separate evaluations as required by the RFA and rebutted the presumption of good faith. If Highmark

submitted the same application in all five zones, considering the differences in the zones, Highmark should not have received the same score in each zone. Neither DHS nor Designee explain this anomaly. This scoring anomaly is also inconsistent with prior procurements. By comparison, in 2019, DHS issued RFA No. 07-19 (2019 RFA), in which the evaluation criteria and procedure were nearly identical to those here. *See id*. at 896a-951a. DHS scored Highmark's predecessor's application differently across each of the geographic zones. *See id*. at 507a, 514a, 521a.

DHS and Selected Applicants respond that each zone was evaluated independently, as required by the RFA. The McCoy Declarations confirmed that zone-specific scoring occurred and that no evaluator submitted a single score across all zones. Applicants could choose to submit one application for all zones, with zone-specific differences only if an applicant elected to provide them. Nothing in the RFA prohibited identical scores or required variation in scoring. The identical scores across different zones do not prove improper evaluation or failure to abide by the RFA terms. Highmark's claims are purely speculative. Highmark failed to carry its heavy burden of proving the evaluations were not conducted separately by zone. The burden was never on DHS to disprove Highmark's assumptions. DHS is entitled to the presumption of good faith.

**2. Analysis**

To begin, our "review in an appeal from a determination denying a bid protest" is set forth in the Procurement Code. *Pepco Energy Services, Inc. v. Department of General Services*, 49 A.3d 488, 491 n.3 (Pa. Cmwlth. 2012). Section 561 of the Procurement Code provides that agency determinations relating to competitive sealed proposals are final and conclusive unless they are "clearly

8

erroneous, arbitrary, capricious, or contrary to law." 62 Pa. C.S. §561; *see* 62 Pa. C.S. §513(a) and (g); *Center for Climate Strategies, Inc. v. Department of Environmental Protection*, 194 A.3d 742, 744 n.6 (Pa. Cmwlth. 2018); *CenturyLink Public Communications, Inc. v. Department of Corrections*, 109 A.3d 820, 824 n.7 (Pa. Cmwlth. 2015); *Global Tel\*Link Corp. v. Department of Corrections*, 109 A.3d 809, 813 n.8 (Pa. Cmwlth. 2015). Section 1711.1(i) of the Procurement Code similarly provides:

> The [C]ourt shall hear the appeal, without a jury, on the record of determination certified by the purchasing agency. The [C]ourt shall affirm the determination of the purchasing agency unless it finds from the record that the determination is arbitrary and capricious, an abuse of discretion or is contrary to law.

62 Pa. C.S. §1711.1(i).

The "arbitrary and capricious" standard represents a high bar for disappointed bidders to overcome. *See Local Dispensaries, LLC v. Department of Health*, 330 A.3d 550, 555 (Pa. Cmwlth. 2025). An administrative action is "arbitrary and capricious where it is unsupportable on any rational basis because there is no evidence upon which the action may be logically based." *Lynch v. Urban Redevelopment Authority of Pittsburgh*, 496 A.2d 1331, 1335 (Pa. Cmwlth. 1985); *see Cary v. Bureau of Professional and Occupational Affairs*, 153 A.3d 1205, 1210 (Pa. Cmwlth. 2017) (holding that an agency's failure to articulate a rational connection between facts and its decision rendered the action arbitrary and capricious). The United States (U.S.) Supreme Court has opined that the "scope of review under the arbitrary and capricious standard is narrow[,] and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Manufacturers*

*Association v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 43 (1983). Notwithstanding, the U.S. Supreme Court continued:

> [T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made. In reviewing that explanation, [the court] must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . The reviewing court should not attempt itself to make up for [an agency's] deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

*Id*. (citation and internal quotation marks omitted); *accord Cary*, 153 A.3d at 1210. "[A]n abuse of discretion occurs if, in reaching a conclusion, the law is overridden or misapplied or judgment exercised is manifestly unreasonable or is the result of partiality, prejudice, bias, or ill will." *CenturyLink*, 109 A.3d at 827 n.13 (citation and quotation omitted). "An error of law occurs where an agency interprets its governing statutes, regulations, or orders contrary to their clear and plain meaning or fails to follow its own regulations and procedures." *Aetna Better Health of Pennsylvania, Inc. v. Pennsylvania Department of Human Services* (Pa. Cmwlth., No. 652 M.D. 2020, filed November 17, 2021), slip op. at 11 n.7.[7]

The Procurement Code provides the exclusive procedure for the limited remedy available for offerors seeking contracts or agreements with state agencies that are aggrieved by the solicitation, *i.e.*, RFAs or requests for proposals (RFPs), or award of a government contract. Section 1711.1 of the Procurement Code, 62 Pa. C.S. §1711.1. A bid protestor may file a protest with the head of the

---

[7] Unreported memorandum opinions of this Court filed after January 15, 2008, may be cited for their persuasive value pursuant to Rule 126(b) of the Pennsylvania Rules of Appellate Procedure, Pa. R.A.P. 126(b), and Section 414(a) of the Court's Internal Operating Procedures, 210 Pa. Code §69.414(a).

purchasing agency. 62 Pa. C.S. §1711.1(a). "A protest shall state all grounds upon which the protestant asserts the solicitation or award of the contract was improper." 63 Pa. C.S. §1711.1(c).

Once a protest is filed, Section 1711.1(e) provides:

> The head of the purchasing agency or his designee shall review the protest and any response or reply and *may request and review such additional documents or information he deems necessary to render a decision and may, at his sole discretion, conduct a hearing*. The head of the purchasing agency or his designee shall provide to the protestant and the contracting officer a reasonable opportunity to review and address any additional documents or information deemed necessary by the head of the purchasing agency or his designee to render a decision.

62 Pa. C.S. §1711.1(e) (emphasis added). The agency head is charged with determining whether "the solicitation or award of the contract was contrary to law." 62 Pa. C.S. §1711.1(f). Following review, "the head of the purchasing agency or his designee shall issue a written determination stating the reasons for the decision." *Id*. If the award is determined to be contrary to the law, the remedy is limited to the cancellation of the solicitation or proposed award or revision of the solicitation or proposed award to comply with the law. 62 Pa. C.S. §§1711.1(f), (j), 1711.2(1).

The bid protestant bears the burden of proving that the agency's determination was arbitrary or capricious, constituted an abuse of discretion, or was otherwise contrary to law. *BSI Construction, LLC v. Philadelphia Regional Port Authority*, 329 A.3d 36, 44 (Pa. Cmwlth. 2024); *Reading Blue Mountain and Northern Railroad v. Seda-Cog Joint Rail Authority*, 235 A.3d 438, 459 (Pa. Cmwlth. 2020); *Stanton-Negley Drug Co. v. Department of Public Welfare*, 943 A.2d 377, 387 (Pa. Cmwlth. 2008); *A. Pickett Construction, Inc. v. Luzerne County*

11

*Convention Center Authority*, 738 A.2d 20, 24 (Pa. Cmwlth. 1999); *J.J.D. Urethane Co. v. Montgomery County*, 694 A.2d 368, 370 (Pa. Cmwlth. 1997). To meet this burden, a bid protestant must show that the agency "(1) abused its independent judgment; (2) failed to follow a requirement in the RFP; or (3) incorrectly applied a scoring criterion." *BSI Construction*, 329 A.3d at 44. The burden is a "heavy" one. *J.J.D.*, 694 A.2d at 370. Absent fraud or collusion, a government agency is entitled to a presumption that it acted in good faith and in the best interests of the governmental agency in the procurement process. *McIntosh Road Materials Co. v. Woolworth*, 74 A.2d 384, 393 (Pa. 1950); *Wilson v. City of New Castle*, 152 A.2d 102 (Pa. 1930); *Reading Blue Mountain*, 235 A.3d at 464; *A. Picket Construction*, 738 A.2d at 24; *J.J.D.*, 694 A.2d at 370.

Because the Procurement Code governs, "Administrative Agency Law does not apply to bid protests and appeals of bid protest determinations." *UnitedHealthcare of Pennsylvania, Inc. v. Department of Human Services*, 172 A.3d 98, 105 (Pa. Cmwlth. 2017) (citing 62 Pa. C.S. §1711.1(1)). This means that bid protestants operate under a different procedural framework. The Procurement Code does not provide bid protestants the right to a hearing or the "right to production of documents or other discovery." *Id.*; *see* 62 Pa. C.S. §1711.1; *JPay, Inc. v. Department of Corrections*, 89 A.3d 756, 762 (Pa. Cmwlth. 2014). If documents were not considered by the agency head in reviewing the protest, the documents are not part of the certified record and will not be considered on appeal. *See* 62 Pa. C.S. §1711.1(e).

"Section 513 of the [Procurement] Code does not provide 'rigid, detailed procedure or strict requirements for the [RFP] process, but preserves a great deal of agency discretion, including discretion to determine agency needs in

preparation of [RFP] requirements.'" *Reading Blue Mountain*, 235 A.3d at 458-59 (quoting *Stanton-Negley Drug*, 943 A.2d at 387). However,

> the mere possession of discretionary power by an administrative body does not make it wholly immune from judicial review, but the scope of that review is limited to the determination of whether there has been a manifest and flagrant abuse of discretion or a purely arbitrary execution of the agency's duties or functions.

*American Totalisator Co. v. Seligman*, 414 A.2d 1037, 1041 (Pa. 1980); *accord Reading Blue Mountain*, 235 A.3d at 458-59.

Procuring agencies are required to evaluate bids "based on the requirements set forth in the invitation for bids[.]" 62 Pa. C.S. §512(e). "[A]ll bid evaluation criteria for a Commonwealth contract solicitation must appear in the invitation for bids for the specific solicitation." *Center for Climate Strategies*, 194 A.3d at 744 (citing Section 512(e) of the Procurement Code, 62 Pa. C.S. §512(e)). Procuring agencies are bound by the express provisions of their solicitation documents. *American Totalisator*, 414 A.2d at 1041; *Seda-Cog Joint Rail Authority v. Carload Express, Inc.*, 185 A.3d 1232, 1240 (Pa. Cmwlth. 2018), *aff'd*, 238 A.3d 1225 (Pa. 2020). Agencies must evaluate the proposals based solely on the factors and subfactors specified in the solicitation. *See American Totalisator*, 414 A.2d at 1041. An agency's failure to follow solicitation terms may be grounds for judicial intervention. *Id.*; *BSI Construction*, 329 A.3d at 44.

Per the RFA, applicants were invited to submit an application for one or more zones. R.R. at 46a, 50a. If submitting an application for multiple zones, applicants were required to "provide zone-specific technical and CPP information in separate tabs and separate SDB and VBE Submittals by zone as set forth in Section I-14.B." *Id.* at 46a. More specifically,

[I]f an Applicant is submitting for multiple zones, any and all portions of the Technical and CPP Submittals that describe different, separate, or additional components specifically designed to address the RFA requirements in one particular zone must be provided under separate tabs of the Applicant's response for a particular section or question, and clearly labeled as "Section or Question [insert number and name of relevant section or question] CHC [ zone name] Zone" and Section or Question [insert number and name of relevant section or question] Health Choices [ zone name] Zone," respectively. For example, Applicants will note in Part III, under "Personnel", the Department is specifically requesting that any such different, separate, or additional organizational structure(s) or personnel be provided under separately tabbed sections of the Applicant's application, and clearly labeled as "Part III, Section III-4.C CHC [zone name] Personnel," respectively. If submitting for multiple zones, Applicants must include separate SDB and VBE Submittals for each zone in its application. The Applicant must indicate the zone(s) for which they are applying for on the Application Cover Sheet (Appendix A). To be considered, the application should respond to all application requirements. Applicants should provide any other information thought to be relevant, but not applicable to the enumerated categories, as an appendix to the application. All SDB and VBE cost data should be kept separate from and not included in the Technical Submittal.
. . . .

*Id.* at 50. The RFA provided a map and detailed description of the zones:

A. The Southwest zone ("SW") includes Allegheny, Armstrong, Beaver, Bedford, Blair, Butler, Cambria, Fayette, Greene, Indiana, Lawrence, Somerset, Washington and Westmoreland Counties.

B. The Southeast zone ("SE") includes Bucks, Chester, Delaware, Montgomery and Philadelphia Counties.
C. The Lehigh/Capital zone ("L/C") includes Adams, Berks, Cumberland, Dauphin, Franklin, Fulton, Huntingdon, Lancaster, Lebanon, Lehigh, Northampton, Perry and York Counties.

14

D. The Northwest zone ("NW") includes Cameron, Clarion, Clearfield, Crawford, Elk, Erie, Forest, Jefferson, McKean, Mercer, Potter, Venango and Warren Counties.

E. The Northeast zone ("NE") includes Bradford, Carbon, Centre, Clinton, Columbia, Juniata, Lackawanna, Luzerne, Lycoming, Mifflin, Monroe, Montour, Northumberland, Pike, Schuylkill, Snyder, Sullivan, Susquehanna, Tioga, Union, Wayne and Wyoming Counties.

*Id*. at 43a-44a. The RFA included a chart showing historical information on eligible populations included in the CHC Program in each of the zones. *Id*. at 44a.

In turn, DHS was required to "evaluate all applications separately, and . . . award [multiple] Agreements . . . to no fewer than three and no more than five CHC-MCOs in each of the five CHC zones." R.R. at 46a. "In determining the number of CHC-MCOs to be awarded in each zone, [DHS] will consider the population of a zone, [DHS]'s experience with the CHC Program, and the ability of a zone to support multiple CHC-MCOs." *Id*. To take into account the CHC's five separate geographic zones, the RFA stated: "The evaluation committee *will evaluate Technical Submittals for each zone separately*." *Id*. at 58a (emphasis added). "For the zone(s) that an Applicant includes in its application," DHS's evaluation will consider:

> o Whether the Applicant has fully and appropriately accounted for the particular or specific resources available to and challenges face[d] by the populations in the zone;
>
> * * * *
>
> o Whether the Applicant's approach has been *specifically crafted to address the particular and unique demographic, cultural, economic, geographic, or other relevant characteristics* of the regions, counties, and municipalities comprising the zone(s).

15

＊ ＊ ＊ ＊

- o Corporate background and history, including the quality, relevancy, and recency of prior work by both the company and the specific individual employees who will be assigned to the zone, as well as the company's history of promoting diversity and inclusion;

＊ ＊ ＊ ＊

- o The sufficiency, quality, and feasibility of the CHC-MCO's overall organizational structure and its proposed organizational structure, functions, staff, and subcontractors (if used) for the operation in the zone; and

- o The education, experience, qualifications, and other information as required in Part III for Executive Management, Key Administrative, and subcontracted staff to support operations in each zone.

R.R. at 59a (emphasis added).

The RFA provided that the "Issuing Office will combine the evaluation committee's final technical scores, in accordance with the relative weights assigned[.]" R.R. at 60a. The final technical scores would be determined "by giving the maximum number of technical points available to the application with the highest raw technical score and the remaining applications rated by applying" the following formula:

$$\frac{\text{Raw Technical Score of Proposal Being Scored}}{\text{Highest Raw Technical Score}} \times A = \text{Final Technical Score}$$

*Id*. at 59a-60a; RFP Scoring Formula.[8]  The Issuing Office would then "rank responsible Applicants by zone according to their total overall score assigned to

---

[8]   The RFP Scoring Formula is available online at: https://www.pa.gov/agencies/dgs/procurement-resources/rfp-scoring-formula (last visited April 1, 2026).

16

each, in descending order[,] and select for negotiations for each zone the Applicants with the highest overall score." *Id*. at 60a-61a.

Highmark applied for all five zones, as did the seven other MCOs. Despite the RFA's specifications that required applicants to provide zone-specific submittals and information and the evaluation committee to evaluate the submittals for each zone separately, each applicant received the **exact same numerical technical score, down to the second decimal point,** across all five zones. R.R. at 311a. This outcome is statistically implausible considering the unique composition of each zone. For example, the SE zone, which includes Philadelphia, has more than double the eligible population as the NW zone. *See id*. at 44a. If an applicant submitted the same or similar technical information for each zone, the scoring should have varied to reflect the zone-specific criteria. Conversely, if the applications were tailored to each zone (describing "different, separate, or additional components specifically designed to address the RFA requirements in one particular zone," R.R. at 50a), it is even more unlikely that the scores would be identical across all five zones. There was no scoring variation among the seven applicants across the five zones.

This scoring anomaly is further highlighted by comparison to the 2019 RFA, in which DHS invited applicants to submit proposals in one or more zones under a nearly identical evaluation framework. *See* R.R. at 896a-951a. Highmark presented evidence showing that its predecessor received varying scores across zones in the 2019 CHC procurement, which supports the expectation that zone-specific evaluations should yield variations in results. *See* R.R. at 507a, 514a, 521a.

Remarkably, DHS has not articulated any explanation for the uniformity in scoring. Relying entirely on the McCoy Declarations, DHS sidesteps

17

the issue and maintains that each zone was evaluated independently and that the evaluation workbooks and instructions were structured accordingly. According to the McCoy Declaration, "[t]he Evaluation Workbook contained specific scoring sections for each individual zone and did not contain a section for scoring on a statewide level." R.R. at 298a. "[DHS] separately reviewed and evaluated each applicant's application for each CHC zone." *Id*.; *see id*. at 28a; First Determination, at 7, ¶24. Further,

> [a]t the conclusion of the group scoring meeting, each evaluator provided me with his or her completed evaluation workbook. Every member of the evaluation committee provided an individual score by zone for each established evaluation criterion. There were no members of the Evaluation Committee that submitted a single score applicable to all zones. The individual scores for each evaluation criterion within each zone were tallied to arrive at the overall score for each zone.

R.R. at 298a.

The McCoy Declarations offer only conclusory assertions that each zone was evaluated separately but are devoid of any explanation for how the applications were scored by zone and why the scores produced were identical across all five zones for all seven applicants. In addition to the McCoy Declarations, DHS produced the August 21, 2024 non-selection letter, which merely showed the selection results, and the Recommendation Memo, which showed final scores and no other evaluation data. *See* R.R. at 20a-21a, 308a-315a. None of these documents provide a rational connection between the identical scores and zone-by-zone evaluation mandate. While the actual scoring workbooks or evaluator instructions may have shed light on the anomaly, these documents were never offered by DHS.

18

Designee accepted the statements in the McCoy Declarations that the evaluations were conducted on a zone-by-zone basis. She chose not to "request and review such additional documents or information," 62 Pa. C.S. §1711.1(e), that would have corroborated these statements or otherwise explained the anomaly. Designee summarily rejected the anomaly explaining that "no documents, including the RFA, state that an evaluation of applications by individual zones could not result in applicants receiving the same evaluation score for different zones." First Determination at 19. While true, this explanation offers no rationale for why the anomaly occurred if the applications were separately evaluated by zones as declared. Perhaps the zones were graded on a pass/fail basis with no points assigned? Or perhaps the evaluation committee weighted compliance over qualitative differences? Whatever the reason may be, DHS has not articulated one. As a reviewing court, "[w]e may not supply a reasoned basis for the agency's action that the agency itself has not given." *Motor Vehicle*, 463 U.S. at 43.

Ultimately, Designee relied on the presumption of agency good faith in denying Highmark's bid protests. Although DHS is entitled to a presumption of good faith, this presumption is rebuttable. Highmark's evidence of the scoring uniformity contrasted with varied scoring in a similar RFA was sufficient to overcome the presumption. *See Commonwealth v. DiFrancesco*, 329 A.2d 204, 208 (Pa. 1974) (quoting *Tot v. United States*, 319 U.S. 463, 467-68 (1943)) (holding a "presumption cannot be sustained if there be no rational connection between the fact proved and the ultimate fact presumed . . . ."); *see, e.g., Caddell Construction Co., Inc. v. United States*, 111 Fed.Cl. 49, 91 (Fed. Cl. 2013) (agency's unexplained reversal of a prequalification decision without supporting documentation caused the

19

court to reject the presumption of good faith and demand proof).[9]  This evidence calls into question the integrity of the competitive bidding process, highlights a lack of transparency, and supports an inference of irregularity or noncompliance with the RFA's mandatory requirements.

In response, DHS offered only conclusory declarations and failed to offer a reason or produce the evaluation workbooks or other documentation that could rationally explain this anomaly.  By accepting DHS's position without requiring corroborating evidence or explanation, Designee abdicated her oversight responsibility, abused her discretion, and hindered this Court's review.

In sum, the Procurement Code does not shield agencies from judicial review where there has been an abuse of discretion or an arbitrary execution of duties.  *See Reading Blue Mountain*, 235 A.3d at 458-59.  Agencies must provide a rational basis for their decisions, and unexplained anomalies, particularly those that defy statistical plausibility, constitute arbitrary and capricious action.  *See American Totalisator*, 414 A.2d at 1041 (finding judicial intervention warranted where the Commonwealth failed to follow its own solicitation terms, undermining the benefits of competitive bidding); *see also Cary*, 153 A.3d at 1210 (holding that an agency's failure to articulate a rational connection between facts and its decision rendered the action arbitrary and capricious).  The identical scoring across all five zones supports Highmark's claim that DHS failed to conduct zone-specific evaluations as required by the RFA.  Absent any rational basis for the scoring uniformity, we are constrained to conclude that DHS's award selection was arbitrary, capricious, and contrary to law.

---

[9] Although we are not bound by decisions of lower federal courts, such decisions may be given persuasive effect.  *In re Stevenson*, 40 A.3d 1212, 1221 (Pa. 2012).

## IV. Conclusion

Accordingly, we reverse the Designee's Determinations denying Highmark's consolidated bid protests and cancel the award of the RFA.[10] *See* Section 1711.1(j) of the Procurement Code, 62 Pa. C.S. §1711.1(j).[11]

_____
MICHAEL H. WOJCIK, Judge

President Judge Cohn Jubelirer did not participate in the decision of this case.
Judge Fizzano Cannon did not participate in the decision of this case.

---

[10] In light of this determination, we do not address the remaining issues.

[11] Section 1711.1(j) of the Procurement Code states:

> Remedy. -- if the determination is not affirmed, the court may enter any order authorized by 42 Pa. C.S. §706 (relating to disposition of appeals), provided that, if the court determines that the solicitation or award of a contract is contrary to law, then the remedy the court shall order is limited to canceling the solicitation or award and declaring void any resulting contract.

62 Pa. C.S. §1711.1(j).

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Gateway Health Plan, Inc.
d/b/a Highmark Wholecare,

           Petitioner

        v.

Department of Human Services,

           Respondent

:  **CONSOLIDATED CASES**
:
:
:
:
:
:
:  No. 147 C.D. 2025
:  No. 526 C.D. 2025
:
:
:

# **O R D E R**

AND NOW, this 2<u>nd</u> day of <u>April</u>, 2026, the two final determinations of the Designee for the Secretary of the Pennsylvania Department of Human Services, dated January 21, 2025, and April 14, 2025, denying Petitioner's bid protests are REVERSED, and the award of the Request for Application No. 31-22 is CANCELLED.

_____
MICHAEL H. WOJCIK, Judge